# EXHIBIT "A"

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| ETC NORTHEAST PIPELINE, LLC | CIVIL DIVISION |
| Plaintiff and Counterclaim Defendant, | No. GD-19-002052 |
| v. | **Code:** 180 Declaratory Judgment |
| EM ENERGY PENNSYLVANIA, LLC | **ANSWER, NEW MATTER, AND COUNTERCLAIMS** |
| Defendant and Counterclaim Plaintiff. | Filed on behalf of Defendant and Counterclaim Plaintiff |

Counsel of Record for this Party:

Megan S. Haines
PA ID No. 203590
McGuireWoods LLP
Tower Two Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
mhaines@mcguirewoods.com
412-667-7920

**NOTICE TO PLEAD**

**YOU ARE HEREBY NOTIFIED TO FILE A WRITTEN RESPONSE TO THE ENCLOSED NEW MATTER AND COUNTERCLAIMS WITHIN TWENTY (20) DAYS FROM SERVICE HEREOF OR A JUDGMENT MAY BE ENTERED AGAINST YOU**

By: **/s/ Megan S. Haines**
     **Counsel for Defendant**

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
lara.buchwald@davispolk.com
212-450-4351
(Motion for Admission *Pro Hac Vice* forthcoming)

**JURY TRIAL DEMANDED**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| ETC NORTHEAST PIPELINE, LLC, | |
| Plaintiff and Counterclaim Defendant, | CIVIL DIVISION |
| v. | No. GD-19-002052 |
| EM ENERGY PENNSYLVANIA, LLC, | |
| Defendant and Counterclaim Plaintiff. | |

**ANSWER, NEW MATTER, AND COUNTERCLAIMS**

AND NOW, comes the Defendant, EM Energy Pennsylvania, LLC ("EdgeMarc"), by and through its counsel, McGuireWoods LLP and Davis Polk & Wardwell LLP, who responds to the Complaint of ETC Northeast Pipeline, LLC ("ETC") as follows:

**PRELIMINARY STATEMENT**

On September 10, 2018, a segment of ETC's natural gas gathering and processing system ("Revolution System") located in Beaver County, Pennsylvania exploded ("Revolution Explosion"). Upon investigation, the Pennsylvania Department of Environmental Protection ("DEP") identified numerous violations of environmental regulations relating to erosion and sedimentation control, as well as earth stability, which resulted in a landslide and caused the Revolution Explosion.

DEP has repeatedly stated that ETC has failed to rectify the violations. In October 2018, DEP issued a compliance order to resolve outstanding erosion and sedimentation issues and to stop all other earthwork associated with the Revolution System. In light of ongoing compliance issues, on February 8, 2019, DEP took the rare step of invoking a permit block, suspending review of all clean water permit applications and other pending approvals for ETC, its parent, Energy Transfer LP ("Energy Transfer"), and their affiliates until further notice. As Governor

1

Wolf summarized the same day, "[t]here has been a failure by Energy Transfer and its subsidiaries to respect our laws and our communities. This is not how we strive to do business in Pennsylvania, and it will not be tolerated."

EdgeMarc, an oil and gas exploration company with natural gas production in Western Pennsylvania, has been directly and continuously injured by ETC's failures of performance, including the Revolution Explosion. EdgeMarc had a contract with ETC for ETC: (1) to ship and process EdgeMarc's natural gas on the Revolution System; (2) to market and sell, on behalf of EdgeMarc, natural gas liquids (ethane and propane, principally) processed out of the natural gas for EdgeMarc by ETC; and (3) most importantly, to ultimately deliver, after gathering and processing, pipeline-quality natural gas for EdgeMarc from ETC's natural gas processing plant into the interstate natural gas pipeline system owned by ETC's affiliate, Rover Pipeline, LLC ("Rover"), via a natural gas lateral pipeline, also owned and operated by Rover. But after years of investment, *ETC never placed the Revolution System "in commercial service."* It was not "in commercial service" at the time of the Revolution Explosion, and it remains out of service to this day.

To make matters worse, ETC has taken every opportunity to use the Revolution Explosion to its benefit – contriving a post-explosion notice to EdgeMarc that ETC had finally placed the Revolution System "in commercial service" mere hours before the explosion, concocting a second post-explosion notice to EdgeMarc asserting that the Revolution Explosion was an "act of God" and cured its obligations under applicable contracts, fabricating invoices to EdgeMarc as if the Revolution Explosion had never happened, and demanding over $7.3 million in credit support based on these purported invoices.

2

As a result, this dispute is not about EdgeMarc's alleged failure to pay $400,000 for services not rendered. It is about ETC's own failure to perform under clear contracts between the parties, and millions of dollars of resulting damage that EdgeMarc has suffered, and continues to suffer, due to ETC's nonperformance.

**ANSWER**

## I.    INTRODUCTION[1]

1.    Denied. Paragraph 1 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 1 and respectfully refers the Court to (i) the Amended and Restated Gathering and Processing Agreement between EdgeMarc and ETC, dated November 13, 2017 (the "Gathering and Processing Agreement"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101), dated November 13, 2017 ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102), dated November 13, 2017 ("ITC-102"), (together, the "Agreements") for the contents of the Agreements. EdgeMarc denies any characterization of the Agreements.

2.    Denied. Paragraph 2 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits that the "Guaranteed In-Service Date" was January 1, 2019. EdgeMarc otherwise denies the allegations in Paragraph 2, and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

---

[1] EdgeMarc incorporates certain headings contained in ETC's Complaint for the Court's convenience only. Their inclusion is not an admission of the contents thereof, which is expressly denied.

3.     Denied. Paragraph 3 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies that the Revolution System was placed "in commercial service" on September 9, 2018 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

4.     Denied in part. EdgeMarc denies the allegations in Paragraph 4, except that it admits that it received a notice from ETC on September 10, 2018. EdgeMarc respectfully refers the Court to the notice for its contents. EdgeMarc denies any characterization of the Agreements.

5.     Denied. Paragraph 5 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 5 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

6.     Denied. Paragraph 6 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits that EdgeMarc sent a notice to ETC on January 29, 2019, otherwise denies the allegations in Paragraph 6, and respectfully refers the Court to the Agreements and the notice for their contents. EdgeMarc denies any characterization of the Agreements.

7.     Denied. Paragraph 7 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies that ETC is entitled to declaratory relief.

## II.    PARTIES

8.      EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.  Therefore, the allegations of Paragraph 8 are denied.

9.      EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.  Therefore, the allegations of Paragraph 9 are denied.

10.     Denied.  Paragraph 10 purports to state legal conclusions as to which no response is required.

11.     Denied in part.  EdgeMarc admits the allegations in the first sentence of Paragraph 11, admits that it has a place of business at 1800 Main Street, Suite 220, Canonsburg, Pennsylvania, and otherwise denies the allegations in Paragraph 11.

## III.    JURISDICTION, VENUE, AND GOVERNING LAW

12.     Paragraph 12 purports to state legal conclusions as to which no response is required.

13.     Paragraph 13 purports to state legal conclusions as to which no response is required.

14.     Paragraph 14 purports to state legal conclusions as to which no response is required.

15.     Paragraph 15 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 15. EdgeMarc specifically denies that ETC is entitled to relief under the Declaratory Judgments Act.

16.     Paragraph 16 purports to state legal conclusions as to which no response is required.

17.     Paragraph 17 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 17.

18.     Paragraph 18 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits that redacted versions of the Agreements appear to be attached as Exhibits A and B to the Complaint. EdgeMarc otherwise denies the allegations in Paragraph 18 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

**IV.     FACTUAL BACKGROUND**

19.     Admitted.

20.     Denied. Paragraph 20 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

21.     Denied. Paragraph 21 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

22.     Denied. Paragraph 22 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

23.     Denied. Paragraph 23 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

24.     Denied. Paragraph 24 purports to state legal conclusions as to which no response
is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the
Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

25.     Admitted.

26.     Paragraph 26 purports to state legal conclusions as to which no response is
required. To the extent a response is required, EdgeMarc admits that ETC has accurately quoted
a provision of ITC-101 and otherwise respectfully refers the Court to the Agreements for their
contents.

27.     Paragraph 27 purports to state legal conclusions as to which no response is
required. To the extent a response is required, EdgeMarc admits that ETC has accurately quoted
a provision of ITC-101 and otherwise respectfully refers the Court to the Agreements for their
contents.

28.     Paragraph 28 purports to state legal conclusions as to which no response is
required. To the extent a response is required, EdgeMarc respectfully refers the Court to the
Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

29.     Denied. EdgeMarc denies the allegations in Paragraph 29.

30.     Denied. EdgeMarc denies the allegations in Paragraph 30.

31.     Denied. Paragraph 31 purports to state legal conclusions as to which no response
is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph
31 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any
characterization of the Agreements.

32.     Denied. EdgeMarc denies the allegations in Paragraph 32.

33.     Denied. EdgeMarc denies the allegations in Paragraph 33.

34.     Denied. EdgeMarc denies the allegations in Paragraph 34.

35.     Denied. Paragraph 35 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 35.

36.     Denied. The allegations of Paragraph 36 refer to a letter agreement, a document which speaks for itself. EdgeMarc respectfully refers the Court to the letter agreement for its contents and EdgeMarc denies any characterization thereof.

37.     Denied. EdgeMarc denies the allegations in Paragraph 37. EdgeMarc specifically denies that gas provided to ETC on September 9, 2018 was provided for "commercial service."

38.     Denied. The allegations in Paragraph 38 refer to a Transaction Confirmation, which speaks for itself. EdgeMarc refers the Court to the Transaction Confirmation for its contents and denies any characterization thereof. By way of further response, EdgeMarc denies the allegations in Paragraph 38.

39.     Denied in part. EdgeMarc denies the allegations in Paragraph 39, except that it admits that it received a notice from ETC on September 10, 2018.

40.     Denied. Paragraph 40 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 40 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

41.     Denied. Paragraph 41 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 41 and respectfully refers the Court to the Agreements for their contents.

42.  Denied. EdgeMarc denies the allegations in Paragraph 42.

43.  Denied as stated. EdgeMarc denies the allegations in Paragraph 43 as stated.

44.  Denied. EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45.  Denied. EdgeMarc denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 45. EdgeMarc otherwise denies the allegations in Paragraph 45 and respectfully refers the Court to the Agreements for their contents.

46.  Denied. EdgeMarc denies the allegations in Paragraph 46.

47.  Denied. EdgeMarc denies the allegations in Paragraph 47.

48.  Denied in part. EdgeMarc admits that ETC purported to send it invoices under ITC-101 on February 1, 2019, and otherwise denies the allegations in Paragraph 48.

49.  Denied as stated. EdgeMarc admits only that it received a notice from ETC on January 17, 2019. EdgeMarc denies the remaining allegations of Paragraph 49.

50.  Denied. Paragraph 50 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 50 and respectfully refers the Court to the Agreements for their contents.

51.  Denied. Paragraph 51 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 51.

52.  Denied in part. Paragraph 52 references a January 22, 2019 letter, which speaks for itself. EdgeMarc refers the Court to the letter for its contents and denies any characterization

9

thereof. By way of further response, EdgeMarc admits only that EdgeMarc sent ETC a letter on January 22, 2019. The remaining allegations are denied.

53.     Denied in part. Paragraph 53 references a January 22, 2019 letter, which speaks for itself. EdgeMarc refers the Court to the letter for its contents and denies any characterization thereof. By way of further response, EdgeMarc admits only that EdgeMarc sent ETC a letter on January 22, 2019. The remaining allegations are denied.

54.     Paragraph 54 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits only that it received a letter from ETC on January 29, 2019. The remaining allegations are denied.

55.     Denied in part. EdgeMarc admits only that it sent ETC a letter on January 29, 2019. The remaining allegations are denied.

56.     Denied in part. Paragraph 56 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits only that it continues to be willing to perform its obligations under the Gathering and Processing Agreement. The remaining allegations are denied.

57.     Admitted.

58.     Denied. Paragraph 58 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 58 and respectfully refers the Court to the Agreements for their contents.

### V.     CAUSES OF ACTION

### COUNT I:  DECLARATORY JUDGMENT

59.     EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

60.    Denied. Paragraph 60 purports to state legal conclusions as to which no response is required.

61.    Denied. Paragraph 61 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 61.

62.    Denied. Paragraph 62 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits only that ETC did not meet the Guaranteed In-Service Date under ITC-101. The remaining allegations are denied.

Answering the "WHEREFORE" clause following Paragraph 62, EdgeMarc denies that ETC is entitled to any judgment, recovery, or relief whatsoever.

### COUNT II:  BREACH OF CONTRACT

63.    EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

64.    Denied. Paragraph 64 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 64 and respectfully refers the Court to the Agreements for their contents.

65.    Denied. Paragraph 65 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 65.

66.    Denied. Paragraph 66 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 66.

Answering the "WHEREFORE" clause following Paragraph 66, EdgeMarc denies that ETC is entitled to any recovery or relief whatsoever.

## COUNT III:  UNJUST ENRICHMENT

67.     EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

68.     Denied.  Paragraph 68 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 68.

69.     Denied.  Paragraph 69 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 69.

70.     Denied.  Paragraph 70 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 70.

Answering the "WHEREFORE" clause following Paragraph 70, EdgeMarc denies that ETC is entitled to any judgment, recovery, or relief whatsoever.

## VI.   JURY DEMAND

71.     No response to the ETC's jury demand in Paragraph 71 is required.  To the extent a response is required, EdgeMarc reserves the right to move to strike ETC's jury demand.

Answering the "Relief Requested" clause following Paragraph 71, EdgeMarc denies that ETC is entitled to any judgment, recovery or relief whatsoever.

## NEW MATTER

72.     EdgeMarc asserts the following defenses without assuming the burden of any such defense that would otherwise rest on ETC, and with reservation of its right to amend or supplement its Answer and New Matter for any reason, including based upon evidence developed in discovery or otherwise.

73.     The Complaint, and each claim for relief asserted therein, fails to state a claim upon which relief can be granted.

74.     ETC's claims are precluded, in whole or in part, by the doctrine of unclean hands.

75.     ETC's claims are barred, in whole or in part, because it has not suffered any injury or damages and/or suffered any recoverable damages.

76.     Although EdgeMarc denies that ETC suffered any damages as alleged in the Complaint, any damages that may have been sustained were not caused by any actions or omissions by EdgeMarc.

77.     ETC's claims are barred, in whole or in part, by ETC's failure to mitigate any damages incurred.

78.     ETC's claims are barred, in whole or in part, by the doctrine of failure of consideration.

79.     ETC's claims are barred, in whole or in part, because ETC materially breached the Agreements.

80.     ETC's claims are barred, in whole or in part, to the extent that EdgeMarc's alleged actions were justified.

81.     ETC's claims are barred, in whole or in part, by EdgeMarc's payment for all services actually received and properly invoiced.

82.    ETC's claims are barred, in whole or in part, by impossibility of performance.

83.    ETC's claims are barred, in whole or in part, by estoppel.

84.    EdgeMarc acted reasonably and in good faith at all times based on all relevant facts and circumstances known by it at the time it so acted.

WHEREFORE, having denied the material allegations against it, and having asserted its affirmative defenses to ETC's Complaint, EdgeMarc respectfully requests that the Court dismiss the Complaint, and award it costs and fees, as well as all other relief the Court deems just and proper.

## COUNTERCLAIMS

85.     EdgeMarc incorporates by reference the above responses and assertions as if set forth fully herein.

### I.     INTRODUCTION

86.     EdgeMarc, an oil and gas exploration company based in Pennsylvania, produces clean-burning natural gas from the Appalachian Basin.  To bring its natural gas to the market, EdgeMarc contracted with ETC, a subsidiary of Energy Transfer, to gather, process, and transport its gas.  As part of this agreement, ETC agreed to build and operate the Revolution System in western Pennsylvania, and EdgeMarc committed to ship and have its natural gas processed and delivered on this system.

87.     Despite the agreement, the Revolution System is not currently "in commercial service," nor has it ever been.  As a result, EdgeMarc is suffering substantial financial losses each and every day that ETC fails to gather, process, and transport EdgeMarc's gas.  Despite EdgeMarc's adherence to the terms of its agreements with ETC, EdgeMarc is now unable to transport its natural gas to the market for one main reason:  ETC failed to comply with pertinent environmental regulations and prudent pipeline construction guidelines.  The direct consequence of ETC's conduct – including its well-documented failures to undertake necessary erosion and sediment control measures – was a landslide during the buildout of the Revolution System, resulting in a segment of pipeline in Beaver County being displaced down a hill which caused a pipeline rupture and explosion on September 10, 2018.

88.     ETC's first instinct was to use the Revolution Explosion to its benefit.  Several hours after the Revolution Explosion, ETC claimed that the Revolution System was "in commercial service" as of the prior day, September 9, 2018.  That same day, ETC claimed that

15

the Revolution Explosion constituted a Force Majeure event – or an "act of God" – under the Agreements. The notices to EdgeMarc were prepared in such haste that one initially identified the wrong company and was only later corrected to identify EdgeMarc. (Exhibit A (September 10, 2018 in-service notice); Exhibit B (September 10, 2018 Force Majeure notice).)

89.    The Revolution Explosion was not an act of God. Indeed, ETC's compliance failures are well documented. For example, after the Revolution Explosion, inspectors from the DEP inspected portions of pipeline on the Revolution System, interviewed workers, and subpoenaed documents in an effort to determine whether ETC's parent, Energy Transfer, was meeting all of its permit obligations.[2] Three days after the Revolution Explosion, a DEP inspector stated that the measures that Energy Transfer took to prevent erosion were "improperly installed, maintained and failed."[3]

90.    Shortly thereafter, on October 29, 2018, the DEP issued a Compliance Order ("October 2018 DEP Order") commanding ETC to stop all work on pipeline on the Revolution System, stabilize the area around the pipeline, repair erosion controls, and submit several plans outlining how to move forward. In the October 2018 DEP Order, the DEP concluded in no uncertain terms that ETC had "[f]ail[ed] to implement or maintain effective erosion and sediment control best management practices . . . , as required by [Pennsylvania Code], that minimize the potential for accelerated erosion and sedimentation . . . ." (Exhibit C (October 2018 DEP Order).)

---

[2] *See* Reid Frazier, *DEP orders ETP to fix Revolution Pipeline erosion problems*, WHYY (a partner of NPR and PBS) (Oct. 31, 2018), https://whyy.org/articles/dep-orders-etp-to-fix-revolution-pipeline-erosion-problems/.

[3] *See* Anya Litvak, *State DEP says company not complying with order after Beaver County pipeline blast*, PITTSBURGH POST-GAZETTE (Jan. 18, 2019), https://www.post-gazette.com/business/powersource/2019/01/18/DEP-Energy-Transfer-Beaver-County-pipeline-blast-Revolution-Center/stories/201901200044.

91.    The October 2018 DEP Order also found that ETC "[f]ail[ed] to provide temporary stabilization, as required by [Pennsylvania Code], upon temporary cessation of earth disturbance activities." Finally, the October 2018 DEP Order stated that ETC "has failed to notify the Department of its inspection results and has failed to submit noncompliance reports." Accordingly, the DEP required ETC to "report all inoperative or ineffective controls to the Department . . . and provide a written noncompliance report within five (5) days." (Exhibit C (October 2018 DEP Order).)

92.    Both before and after the October 2018 DEP Order, ETC racked up regulatory violation after regulatory violation concerning its work on the Revolution System. Between September 13, 2018 and January 17, 2019, the DEP conducted site-level and primary facility-level inspections on pipeline on the Revolution System. In total, the inspections revealed that ETC had committed around 200 "erosion and sediment control" violations, "site stabilization-temporary stabilization" violations, and "general requirements" violations related to failure to meet erosion and sediment control best management practices.[4]

93.    ETC failed to resolve the violations and satisfy the October 2018 DEP Order. On January 10, 2019, after several months of ongoing violations and a lack of remediation effort, the DEP informed ETC in a letter that it was not in compliance with the October 2018 DEP Order. The letter specifically stated that despite the Order, ETC has failed to, among other things, "continuously implement and maintain [erosion and sediment control best management practices]," and "temporarily stabilize all disturbed areas, including ongoing mass earth movement" as required by the Order. The DEP's letter also stated that ETC had failed to submit

---

[4] Pennsylvania Department of Environmental Protection, https://www.ahs.dep.pa.gov/eFACTSWeb/searchResults_singleSite.aspx?SiteID=817832 (last visited February 17, 2019).

to the DEP an adequate "Temporary Stabilization Plan," an "Erosion and Sediment Control Plan," and a "Post Construction Stormwater Management Plan" as required by the Order. (Exhibit D (January 10, 2019 letter from DEP to ETC).)

94.    ETC's failure to take adequate erosion and sedimentation control measures is also problematic because months prior to the September 2018 Revolution Explosion, ETC was on notice that the area where the explosion occurred was problematic, as "[t]his stretch of the pipeline ha[d] been a problem for Energy Transfer before." Namely, in a consent agreement and order from summer 2018, Energy Transfer "was fined and cited for a series of erosion events that took place about a mile from the explosion site."[5]

95.    ETC itself admitted that the area of the Revolution Explosion site was a cause for serious concern. Media outlets reported that according to Energy Transfer's permit documents, "the area where the pipeline burst is on a slope of more than 20 degrees, with even steeper areas nearby," "[t]he type of soil on the site is considered to have 'high' potential for erosion, and a field survey of a wetland a few hundred feet down the pipeline's path was *categorized by the company* as having a 'slip landslide area' and 'dangerous and unstable hillslope terrain.'"[6]

96.    As a result of ETC's conduct, the DEP has suspended all reviews of clean water permit applications and other pending approvals for Energy Transfer and its subsidiaries due to ETC's failure to comply with the October 2018 DEP Order. In announcing the suspension, the DEP Secretary stated that DEP inspections following the Revolution Explosion discovered violations including "unreported landslides, impacts to aquatic resources, construction activities

---

[5] Anya Litvak, *State DEP says company not complying with order after Beaver County pipeline blast*, PITTSBURGH POST-GAZETTE (Jan. 18, 2019), https://www.post-gazette.com/business/powersource/2019/01/18/DEP-Energy-Transfer-Beaver-County-pipeline-blast-Revolution-Center/stories/201901200044.

[6] *Id.*

occurring in unpermitted areas, and several sections of the pipeline that required the installation of additional measures to prevent accelerated erosion."[7]

97.    Public information, government statements, and media coverage make abundantly clear that the Revolution Explosion is a classic case of history repeating itself.  For example, upon information and belief, the U.S. Pipeline and Hazardous Materials Safety Administration (PHMSA) has issued 106 violations to Energy Transfer and its Sunoco subsidiary since 2002, resulting in over $5.6 million in fines.  These safety violations included, among others, "[f]ailure to repair unsafe pipe for 5 years," "[f]ailures to maintain pipeline integrity in high consequence areas," "[f]ailure to report unsafe conditions," and "[f]ailure to do corrosion inspection."  Upon information and belief, Energy Transfer and its subsidiaries and joint ventures reported 527 hazardous liquids pipeline incidents to federal regulators between 2002 and 2017, or once every 11 days on average for 16 years.[8]

98.    A Reuters analysis of government data and regulatory records showed that Energy Transfer and its Sunoco subsidiary have racked up "more than 800 state and federal permit violations" in a race to build Rover and Mariner East 2, two large pipelines that carry natural gas from Pennsylvania, Ohio, and West Virginia.  These violations included "spills of drilling fluid, . . . sinkholes in backyards[,] and improper disposal of hazardous waste and other trash."[9]

---

[7] Press Release, Commonwealth of Pennsylvania Department of Environmental Protection, Department of Environmental Protection Issues Hold on All Energy Transfer Clean Water Permit Approvals and Modifications Due to Non-Compliance (Feb. 8, 2019), http://www.ahs.dep.pa.gov/NewsRoomPublic/ articleviewer.aspx?id=21634&typeid=1.

[8] U.S. Pipeline and Hazardous Materials Safety Administration data, as summarized by Greenpeace USA & Waterkeeper Alliance, Oil and Water: ETP & Sunoco's History of Pipeline Spills 3, 4, 6 (2018), https://www.greenpeace.org/usa/wp-content/uploads/2018/04/oil-water-04.17-MECH.pdf.

[9] Scott DiSavino, Stephanie Kelly, *Two U.S. pipelines rack up violations, threaten industry growth*, REUTERS (Nov. 28, 2018), https://www.reuters.com/article/us-usa-pipelines-etp-violations-insight-idUSKCN1NX1E3.

99.    The direct consequence of this pattern of conduct by ETC was the September 10,

2018 Revolution Explosion.  Despite ETC's deliberate efforts to mischaracterize this explosion

as an act of God, all available information makes clear that the explosion and its causes were

within ETC's reasonable control.

## PARTIES

100.    Counterclaim Plaintiff EdgeMarc is a Delaware limited liability company, with its

principal office in Canonsburg, Pennsylvania.  EdgeMarc is an oil and gas exploration and

production company operating in, among other places, Pennsylvania.

101.    Counterclaim Defendant ETC is a Delaware limited liability company with an

office located at 6051 Wallace Road Ext, Suite 300, Wexford, Pennsylvania.  ETC constructs

and operates natural gas gathering and processing systems in Pennsylvania.

## JURISDICTION AND VENUE

102.    This action arises under the laws of the Commonwealth of Pennsylvania and is

within the subject matter jurisdiction of this Court, pursuant to 42 Pa. Cons. Stat. § 931.

103.    Subject matter jurisdiction exists in this case pursuant to the Declaratory

Judgments Act, 42 Pa. Cons. Stat. § 7531 *et seq.*

104.    An award of declaratory relief would remove uncertainty and lead to resolution of

the dispute. 42 Pa. Cons. Stat. § 7537.

105.    This Court has personal jurisdiction over ETC because ETC's principal place of

business is in the Commonwealth of Pennsylvania.  42 Pa. Cons. Stat. § 5301(a)(2).

106.    This Court also has personal jurisdiction over ETC because this action arises

directly out of ETC's agreement to build the Revolution System in the Commonwealth of

Pennsylvania and carry EdgeMarc's gas on the Revolution System.  42 Pa. Cons. Stat. § 5308.

107.    Venue for this action is proper in this Court pursuant to Pennsylvania Rules of Civil Procedure 1006 & 2179 because ETC regularly conducts business in Allegheny County.

## FACTUAL BACKGROUND

**I.    The Gathering and Processing Agreement, ITC-101, and ITC-102**

108.    On November 13, 2017, the parties entered into the amended and restated Gathering and Processing Agreement, which provides that "[ETC] agrees to accept, or cause to be accepted, on a Firm basis those daily quantities of [EdgeMarc's] Gas as set forth in any Individual Transaction Confirmation." (Gathering and Processing Agreement at § 6.3).

109.    Under the Gathering and Processing Agreement, ETC must reserve capacity for EdgeMarc's natural gas. That amount is defined as the "Shipper's Reserved Capacity," or "SRC," which is "the portion of the aggregate daily gathering and processing capacity reserved for [EdgeMarc] for Firm Service in the Gathering System and the Plant." (Gathering and Processing Agreement at § 1.1).

110.    On the same day that they entered into the Gathering and Processing Agreement, the parties also entered into two "Individual Transaction Confirmations," or "ITCs," which "evidenc[e] the specific terms of a Transaction . . . but which shall be subject to the terms and conditions of th[e] [Gathering and Processing Agreement]." (Gathering and Processing Agreement at § 1.1). These two ITCs are ITC-101 and ITC-102, and ITC-101 governs the pipeline where the Revolution Explosion took place in Beaver County on September 10, 2018.

111.    Under ITC-101, ETC agreed to "construct[], own[] and operate[]" a "Gathering System" to receive EdgeMarc's natural gas from certain "Receipt Points" in Butler County and deliver that gas to the "Delivery Point." Specifically, the "Gathering System" that ETC would build under ITC-101 had to "be capable of (i) gathering the SRC from the Receipt Points . . . for

delivery to the Galaxy Compressor Station ('LP-Galaxy Gathering'), (ii) compressing and

dehydrating the SRC at the Galaxy Compressor Station ('Galaxy Compression'), (iii) gathering,

via [ETC's] high pressure gas pipeline ('HPGP'), the SRC from the Galaxy Compressor Station

to [ETC's Revolution I cryogenic processing] Plant ('HP Gathering') and (iv) gathering Residue

Gas from the Plant for delivery to the Delivery Point." (ITC-101 at 2).

112.   ITC-101 defines "Delivery Point" as "inlet flange of the measurement facilities of

Rover Pipeline, LLC, located at or near the tailgate of the [ETC Revolution I cryogenic

processing] Plant" in Washington County. (ITC-101 at 6).

113.   ITC-102 is "coterminous with" ITC-101. (ITC-102 at 2).

## II.   ITC-101 and the Revolution Explosion

114.   Under ITC-101, the "In-Service Date" is defined as "[t]he first Day of the Month

following the Day on which the LP-Galaxy Gathering . . . , Galaxy Compression, HPGP, HP

Gathering, Plant and Delivery Point are <u>completed and placed in commercial service</u> . . . ."

(ITC-101 at 3) (emphasis added).

115.   ETC also agreed to an outside date by which the Revolution System would be

completed and placed "in commercial service." That "Guaranteed In-Service Date" was January

1, 2019. (ITC-101 at 2). If ETC failed to meet the "Guaranteed In-Service Date," EdgeMarc

had an express right to "terminate this ITC upon written notice to [ETC] within thirty (30) Days

of the Guaranteed In-Service Date." (ITC-101 at 5).

116.   ETC's buildout of the Revolution System was marked by delays and problems.
For example:

a.  In a consent agreement and order from summer 2018, Energy
Transfer "was fined and cited for a series of erosion events" that took place about
a mile from the site of the Revolution Explosion;[10]

b.  Between September 2018 and January 2019, DEP inspections of
pipeline on the Revolution System revealed that ETC had committed
approximately 200 "erosion and sediment control" violations, "site stabilization-
temporary stabilization" violations, and "general requirements" violations related
to failure to meet erosion and sediment best management practices;[11]

c.  In October 2018, the DEP concluded that ETC had "[f]ail[ed] to
implement or maintain effective erosion and sediment control best management
practices, as required by [Pennsylvania Code], that minimize the potential for
accelerated erosion and sedimentation . . . ."  (Exhibit C (October 2018 DEP
Order).)

117.   On September 10, 2018, because of ETC's continued and well-documented
failure to implement necessary erosion and sedimentation control measures, a segment of
pipeline on the Revolution System in Beaver County slipped down a hill, ruptured, and
exploded.

---

[10] Anya Litvak, *State DEP says company not complying with order after Beaver County pipeline blast*,
PITTSBURGH POST-GAZETTE (Jan. 18, 2019), https://www.post-gazette.com/business/powersource/2019/01/18/DEP-
Energy-Transfer-Beaver-County-pipeline-blast-Revolution-Center/stories/201901200044.

[11] Pennsylvania Department of Environmental Protection, https://www.ahs.dep.pa.gov/eFACTSWeb/
searchResults_singleSite.aspx?SiteID=817832) (emphasis added) (last visited February 17, 2019).

118.    Rather than working to remediate the problems and bring the Revolution System into "commercial service," ETC contrived two notices on the day of the Revolution Explosion: the first notice asserted that the Revolution System had been placed "in commercial service" on September 9, 2018, while the second notice asserted that the Revolution Explosion constituted a "Force Majeure" under Section 16.1 of the Gathering and Processing Agreement.  (Exhibit A (September 10, 2018 in-service notice); Exhibit B (September 10, 2018 Force Majeure notice).)

119.    In support of its factually inaccurate position that the Revolution System had been placed "in commercial service" mere hours before it exploded, ETC later issued invoices to EdgeMarc under ITC-101 – as if the Revolution Explosion never happened – for certain natural gas that was never gathered, processed, or delivered under ITC-101.  More to the point, prior to the Revolution Explosion, ETC had issued such invoices under a separate billing arrangement.

120.    Notwithstanding ETC's post-explosion efforts to assert that the Revolution System was in "commercial service" as of September 9, 2018 for purposes of ITC-101, the system was not "in commercial service" as of that date (nor has it ever been "in commercial service") for at least three reasons.

121.    First, for the Revolution System to be in commercial service, all portions of it – including the "Delivery Point" – needed to be in commercial service.  However, ETC needed to receive authorization from the Federal Energy Regulatory Commission ("FERC") to place the Revolution Delivery Point in commercial service, and ETC had not received that authorization on September 9 or September 10, 2018.  In fact, publicly available information from FERC makes clear that the Revolution Delivery Point was not in service until October 12, 2018, a full five weeks after the September 10, 2018 Revolution Explosion and ETC's purported "in

commercial service" date of September 9, 2018. (Exhibit E (Letter from Rover Pipeline LLC to FERC, dated October 15, 2018).)

122.    Second, the Revolution System also could not be in commercial service until it underwent a multi-step commissioning process, which can take weeks to complete. As of September 9, 2018, ETC and EdgeMarc had only just begun this commissioning process. As part of this commissioning process, ETC agreed to purchase limited volumes of natural gas to "purge and pack" the Revolution System. Upon information and belief, the purge and pack process was not complete at the time of the Revolution Explosion, and even if that step were complete, it *by definition did not involve the gathering, processing, and delivering of EdgeMarc's gas.*

123.    Third, and relatedly, the Revolution System could not have been in commercial service as of September 9, 2018 because none of EdgeMarc's natural gas was ever commercially available to its customers.

124.    ETC has asserted that the Revolution Explosion constituted an act of God, and that ETC's failure to perform under ITC-101 and the Gathering and Processing Agreement is cured by section 16.1 of the Gathering and Processing Agreement. That provision provides that "[u]nless expressly provided otherwise in this Agreement, no Party shall be liable to any other Party for failure to perform any of its obligations under this Agreement, other than to make payments due, to the extent that and for the period during which such performance is hindered, delayed or prevented by Force Majeure." (Gathering and Processing Agreement at § 16.1).

125.    The Gathering and Processing Agreement defines a "Force Majeure" as one of a series of events "beyond the reasonable control" of the party seeking to invoke the provision:

> [C]auses, conditions, events or circumstances which are ***beyond the reasonable control of the party claiming Force Majeure*** [and] shall include, without limitation, ***to the extent beyond the reasonable control of the Party claiming Force Majeure***, acts of God, wars (declared or undeclared), insurrections, hostilities, strikes, lockouts, riots, floods, fires, acts of nature, industrial disturbances, acts of the public enemy, acts of terrorism, sabotage, blockades, epidemics, landslides, lightning, earthquakes, washouts, arrests and restraints of rulers and peoples, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, or blockages of lines of pipe not due to lack of maintenance, extraordinary operating conditions on [ETC's], [EdgeMarc's] or [EdgeMarc's] facilities or on those of any Downstream Transporter or NGL pipeline, Force Majeure events on any Downstream Transporter or NGL pipeline, inability of any Party to obtain necessary machinery, materials, permits, refusal of one or more landowners to provide necessary easements or rights-of-way, freezing of any well or delivery facility, well blowout, cratering, the partial or entire failure of a well and the act, order, rule or regulation of any court or governmental authority prohibiting a Party from discharging its obligations under this Agreement, ***and any other causes whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming suspension***.

(Gathering and Processing Agreement at § 16.1) (emphasis added).

126.    ETC implemented inadequate erosion and sediment control measures while constructing the Revolution System, had been cited for an unusually high number of permit violations, and had knowingly failed to report to state regulators that there had been landslides and erosion from the pipeline's construction. Under these circumstances, the Revolution Explosion was not "beyond the reasonable control" of ETC and thus did not constitute a Force Majeure.

127.    Section 16.1 of the Gathering and Processing Agreement also provides that "no Party shall be entitled to the benefits of this Section 16.1 to the extent the event of Force Majeure

is caused or affected by any or all of the following circumstances . . . *the Party claiming excuse failed to remedy the condition and to resume the performance of its covenants or obligations with reasonable dispatch*." (Gathering and Processing Agreement at § 16.1) (emphasis added). ETC was not entitled to rely on the Force Majeure provision because it failed to "remedy the condition" and failed to resume performance "with reasonable dispatch."

128.   The Gathering and Processing Agreement also required that "[a] Party claiming Force Majeure shall use commercially reasonable efforts to remove the cause, condition, event or circumstance of such Force Majeure . . . ." (Gathering and Processing Agreement at § 16.3). However, ETC's efforts have been anything but commercially reasonable; the restoration period for the affected pipeline could exceed twelve months, even though ETC's initial estimate was six to eight weeks.

III.   **Shipping and Processing Requirements Under ITC-101**

129.   ETC was obligated to "accept . . . on a Firm basis those daily quantities" of natural gas set forth in ITC-101. (Gathering and Processing Agreement at § 6.3). For example, for the period between November 1, 2018 and April 30, 2019, ETC was obligated to accept 65,000 Mcfd of natural gas from EdgeMarc. (ITC-101 at 4).

130.   ETC's obligation to accept the required quantities of natural gas from EdgeMarc under ITC-101 until the January 29, 2019 termination of ITC-101 was not excused by the Revolution Explosion because that was not a Force Majeure event.

IV.   **Termination of ITC-101**

131.   Because ETC failed to meet the "Guaranteed In-Service Date" of January 1, 2019, EdgeMarc was entitled to terminate ITC-101 "upon written notice to [ETC] within thirty (30) Days of the Guaranteed In-Service Date." (ITC-101 at 5).

132.    Accordingly, on January 29, 2019, EdgeMarc provided written notice to ETC that it was terminating ITC-101 "effective January 29, 2019" under ITC-101's provision for "Failure to Meet Guaranteed In-Service Date." (Exhibit F (notice terminating ITC-101 and ITC-102).) Likewise, ITC-102 "terminated by operation of contract because it is expressly coterminous with ITC-101." *Id.*

133.    Despite the termination of ITC-101 and ITC-102 on January 29, 2019, the Gathering and Processing Agreement remained fully effective. Under the Gathering and Processing Agreement, EdgeMarc is entitled to "submit Nominations . . . for the gathering of Gas hereunder to [ETC]." (Gathering and Processing Agreement at § 6.4).

134.    Accordingly, on January 30, 2019, EdgeMarc submitted Nominations for the quantity of natural gas that it expected to deliver to ETC for the month of February 2019. Despite its obligation to gather and process that gas pursuant to the Gathering and Processing Agreement, ETC refused to do so. (Exhibit G (January 30, 2019 Nomination); Exhibit H (January 30, 2019 refusal to accept Nomination).)

### FIRST COUNTERCLAIM
**Breach of Contract – ITC-101 and Gathering and Processing Agreement**

135.    EdgeMarc incorporates Paragraphs 85 through 134 as though fully set forth herein.

136.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

137.    EdgeMarc and ETC were parties to ITC-101, which was part of and subject to the Gathering and Processing Agreement, and which was validly terminated by EdgeMarc on January 29, 2019.

138.    ETC breached its obligations under the Gathering and Processing Agreement and ITC-101 by failing to put the Revolution System "in commercial service." As a result, ETC failed to meet ITC-101's "Guaranteed In-Service Date" of January 1, 2019.

139.    ETC also breached its obligations under ITC-101 and the Gathering and Processing Agreement by failing to gather and deliver EdgeMarc's gas. The Gathering and Processing Agreement provides that "[ETC] agrees to accept, or cause to be accepted, on a Firm basis those daily quantities of [EdgeMarc]'s Gas as set forth in any [ITC] . . . ." (Gathering and Processing Agreement at § 6.3). ETC failed to accept the required quantities of EdgeMarc's natural gas and its performance was not excused by Force Majeure.

140.    As a result of the breaches by ETC, EdgeMarc has been damaged in an amount to be determined at trial.

## SECOND COUNTERCLAIM
### Breach of Contract – Gathering and Processing Agreement

141.    EdgeMarc incorporates Paragraphs 85 through 140 as though fully set forth herein.

142.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

143.    ETC breached its obligations under the Gathering and Processing Agreement by failing to accept EdgeMarc's Nominations for natural gas for February 2019 and for subsequent periods.

144.    As a result of the breach by ETC, EdgeMarc has been damaged in an amount to be determined at trial.

## THIRD COUNTERCLAIM
### Declaratory Judgment

145.    EdgeMarc incorporates Paragraphs 85 through 144 as though fully set forth herein.

146.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

147.    EdgeMarc and ETC were parties to ITC-101 and ITC-102, which were part of and subject to the Gathering and Processing Agreement.

148.    EdgeMarc and ETC have a dispute regarding their rights and obligations under the Agreements.

149.    ETC breached its obligations under the Gathering and Processing Agreement and ITC-101 by failing to put the Revolution System "in commercial service." As a result, ETC failed to meet ITC-101's "Guaranteed In-Service Date" of January 1, 2019. EdgeMarc was therefore entitled to terminate ITC-101 "upon written notice to [ETC] within thirty (30) Days of the Guaranteed In-Service Date." (ITC-101 at 5). On January 29, 2019, EdgeMarc validly terminated ITC-101 and ITC-102 by written notice to ETC.

150.    ETC has expressly asserted that ITC-101 and ITC-102 remain in force.

151.    On various dates through and including February 22, 2019, ETC issued invoices to EdgeMarc under ITC-101 for certain natural gas that was never gathered, processed, or delivered under ITC-101.

152.    EdgeMarc has expressly disputed such invoices.

WHEREFORE, EdgeMarc seeks a judgment: (1) declaring that EdgeMarc validly terminated ITC-101 and ITC-102 effective January 29, 2019; and (2) declaring that the invoices issued by ETC on various dates through and including February 22, 2019 – including those purportedly issued under ITC-101 – were not properly issued and/or that EdgeMarc rightfully withheld payment on such invoices following ETC's nonperformance under the Agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, EdgeMarc demands judgment against ETC as follows:

a)   Dismissing the Complaint against it with prejudice;

b)   Awarding EdgeMarc damages in excess of the arbitration jurisdictional limits of the Court, in an amount to be determined;

c)   Pre-judgment and post-judgment interest;

d)   Equitable relief, including a preliminary and permanent injunction;

e)   Declaratory relief;

f)   Awarding attorneys' fees and costs; and

g)   Granting such other legal and equitable relief as the Court deems just and proper.

Respectfully submitted,

Dated: February 27, 2019

_/s/ Megan S. Haines_____
Megan S. Haines
McGuireWoods, LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
Phone: 412.667.6000
Fax: 412.667.6050
mhaines@mcguirewoods.com

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
212-450-4351
lara.buchwald@davispolk.com
(Motion for Admission *Pro Hac Vice*
forthcoming)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Answer, New Matter and Counterclaim has been served on counsel of record for Plaintiff by e-mail and first class mail delivery on this 27th day of February 2019, addressed as follows:

Stuart H. Sostmann, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219

*/s/ Megan S. Haines*

# EXHIBIT "B"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDGEMARC ENERGY HOLDINGS, LLC, *et al.,*[1] | Case No. 19-11104 |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF CALLUM STREETER IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Callum Streeter declares and says:

1.       I am the Chief Executive Officer and a member of the board of managers of

EdgeMarc Energy Holdings, LLC ("EdgeMarc").  I have served as EdgeMarc's CEO since

March 2018, prior to which I served as EdgeMarc's Chief Operating Officer since June 2015.  I

have worked in the oil and gas industry in the Appalachian Basin area for more than 13 years,

predominantly in operations in the Marcellus and Utica shales.  Prior to my employment with

EdgeMarc, I worked at Energy Corporation of America, primarily as its Drilling and

Completions Manager, from January 2006 until I joined EdgeMarc in 2012.   I currently serve as

the President and Chairman of the Board of the Appalachian Chapter of the American

Association of Drilling Engineers.  I earned a Bachelor of Civil Engineering from the University

of Canterbury in Christchurch, New Zealand, a Master of Engineering Science in Petroleum

Engineering from the University of New South Wales, and a Certificate of Professional

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: EdgeMarc Energy Holdings, LLC (6900), EM Energy Manager, LLC (5334), EM Energy Employer, LLC (8026), EM Energy Ohio, LLC (6935), EM Energy Pennsylvania, LLC (1541), EM Energy West Virginia, LLC (3771), EM Energy Keystone, LLC (7506), EM Energy Midstream Ohio, LLC (1268), and EM Energy Midstream Pennsylvania, LLC (3963).  The Debtors' corporate headquarters and  mailing address is 1800 Main Street, Suite 220, Canonsburg, PA 15317.

Development from the Wharton School at the University of Pennsylvania.  I am familiar with the

day-to-day operations, business and financial affairs of the Debtors (as defined below).

2.      I submit this declaration (this "Declaration") (a) in support of the Debtors'

petitions for relief under chapter 11 of title 11 of the United States Code (as amended or

modified, the "Bankruptcy Code"), (b) in support of the Debtors' requests for relief in the form

of motions and applications (collectively, the "First Day Motions"), filed contemporaneously

with this declaration, and (c) to assist the United States Bankruptcy Court for the District of

Delaware (the "Court") and other interested parties in understanding the circumstances giving

rise to the commencement of the Debtors' chapter 11 cases (the "Chapter 11 Cases").  I have

reviewed the First Day Motions or have otherwise had their contents explained to me, and it is

my belief that the expedited and other relief sought therein is essential to the uninterrupted

operation of the Debtors' businesses and the maximization of the value of the Debtors' estates as

the Debtors pursue a sale of all or substantially all of their assets.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based

upon my personal knowledge, my review of the relevant documents, information provided to me

by employees working under my supervision, or my opinion based upon experience, knowledge,

and information concerning the operations of the Debtors and the oil and gas industry as a whole.

If called upon to testify, I would testify competently to the facts set forth in this Declaration.

Unless otherwise indicated, the financial information contained herein is unaudited and provided

on a consolidated basis.  I am authorized by the Debtors to submit this Declaration.

**Commencement of Bankruptcy Proceedings**

4.      On the date hereof (the "Petition Date"), EdgeMarc and its direct and indirect

subsidiaries that are debtors and debtors-in-possession in the Chapter 11 Cases (collectively, the

"Company" or the "Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. The Debtors commenced the Chapter 11 Cases to pursue the sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code (the "Section 363 Sale"). The Debtors' business is the exploration and production of natural gas in the Appalachian Basin, concentrated in the Marcellus and Utica shale formations in Monroe and Washington Counties in Ohio and Butler County in Pennsylvania. The Debtors control approximately 45,000 net acres in these regions and have drilled and developed a total of 60 producing wells thereon. The Debtors have forty-two (42) active employees in full-time and part-time positions. The Debtors have approximately $77.79 million outstanding under a secured revolving credit facility and no other funded debt.

6. On September 10, 2018, due to factors entirely outside of the Debtors' control, an explosion (the "Revolution Explosion") occurred along a pipeline and gathering system (the "Revolution System") being built by a third party, ETC Northeast Pipeline LLC ("ETC"), that performs gathering and processing services for the Debtors in Pennsylvania. The Revolution System was expected to go into commercial service around the time of the Revolution Explosion, and would have enabled the Debtors to gather, process and—ultimately—sell, gas from several newly drilled wells in Pennsylvania. Instead, the Revolution Explosion prevented the Debtors from selling the gas produced from those wells. As a result, EdgeMarc experienced a significant reduction in production capacity and revenue from its Pennsylvania operations.

3

7.      The Debtors' gathering and processing agreement with ETC required the Revolution System to be placed into commercial service by January 1, 2019.  Although ETC first estimated that the ruptured portion of the pipeline would be remedied within weeks, it remains out of commercial service to this day, and the Revolution System appears unlikely to be placed into commercial service until early 2020.

8.      In January 2019, because ETC had failed to place the Revolution System in commercial service, the Debtors exercised their right to terminate certain individual transaction confirmations (the "ITCs") that were made part of the gathering and processing agreement. Debtor EM Energy Pennsylvania ("EdgeMarc PA") then provided notice to ETC that it would seek to flow gas through other, intact pipelines on an on-demand basis, as permitted under the gathering and processing agreement, which remained in force.  However, ETC refused to flow the Debtors' gas under those terms.

9.      Because the Debtors could not flow through ETC's Revolution System due to the Revolution Explosion, because ETC refused to gather the Debtors' gas via other infrastructure, and because the Debtors had no other means of selling gas from the affected wells, they determined in their business judgment to "shut in" their Pennsylvania wells and pause all remaining Pennsylvania operations.  When flowing, those Pennsylvania operations account for approximately 50 million net cubic feet per day (MMcfd), or approximately one third of the Debtors' existing production capacity.

10.     Shortly after the Debtors terminated the ITCs, ETC responded by filing a lawsuit in the Court of Common Pleas in Allegheny County, Pennsylvania.  In that lawsuit, ETC sought payment of amounts allegedly outstanding under certain invoices and a declaratory judgment that EdgeMarc PA's termination of the ITCs was invalid.  In February 2019, the Debtors asserted

multiple counterclaims in the litigation, including for breach of contract based on ETC's failure to place the Revolution System in commercial service and its failure to gather contractually-required volumes of the Debtors' gas. The litigation with ETC has been stayed by the commencement of the Chapter 11 Cases.

11.      The Debtors' inability to sell gas from their Pennsylvania properties had a substantial negative impact on their liquidity and ability to satisfy their funded debt, contractual and other payment obligations. In particular, in anticipation of ETC's Revolution System coming online by January 1, 2019 (the "Guaranteed In-Service Date"), as required under their contracts with ETC, the Debtors had contracted for fixed amounts of transportation capacity under certain of their firm transportation service agreements ("FT Agreements"). The Debtors remain contractually obligated to pay for that transportation capacity even though they are unable to transport their natural gas through the applicable pipelines.

12.      In addition, on March 21, 2019, the agent under the Debtors' secured revolving credit facility issued a notice of redetermination of the Debtors' borrowing base thereunder, reducing it from approximately $80 million to $40 million. Under the terms of the agreement governing that facility, the Debtors were required to begin repayment of outstanding amounts in excess of the borrowing base on May 1, 2019. On April 30, 2019, the Debtors received a one-week forbearance to May 8, 2019 for the event of default under the secured revolving credit facility of failing to make the first repayment. On May 7, 2019, the Debtors received an extension of that forbearance through May 15, 2019.

13.      Realizing that they could not continue to satisfy their obligations under the FT Agreements given the cessation of Pennsylvania operations, the Debtors sought to negotiate with certain of their contractual counterparties, including ETC and certain FT Agreement

5

counterparties, to both alleviate short-term liquidity constraints and to find a longer-term solution to the problem created by the Revolution Explosion and resulting cessation of Pennsylvania operations. Unfortunately, the Debtors were unable to reach an agreement with any of those counterparties.

14.     The Debtors, in consultation with their professional advisors, explored various other strategic alternatives and ultimately determined that a sale of all or substantially all of their assets through an auction process conducted under the supervision of the Bankruptcy Court would be the best way to maximize value for the benefit of their stakeholders.

15.     As described in further detail in the Bidding Procedures Motion, to ensure that a winning bid is in fact the highest or otherwise best offer for the purchase of the Debtors' assets, the Debtors have developed bidding and auction procedures (the "Bidding Procedures") that will allow interested parties to submit bids for the Debtors' assets. I believe, based on my knowledge of the Debtors' operations, liquidity constraints, financial obligations, the impact of the pending litigation and prepetition negotiations with key stakeholders, and in consultation with the Debtors' professional advisors, that an auction of the Debtors' assets is the best, and may be the only, means of maximizing the value of the Debtors' estates for all stakeholders.

16.     Section I of this Declaration describes the Debtors' business; Sections II and III describe the circumstances and events giving rise to the commencement of the Chapter 11 Cases, including the Debtors' prepetition restructuring initiatives; and Section IV sets forth a list of the First Day Motions and certain other motions filed contemporaneously with the filing of this Declaration.

# I.

## The Debtors' Business

**A.     Overview of the Debtors' Business**

17.     EdgeMarc (formed on September 30, 2011) is an exploration and production ("E&P") company engaged in the acquisition, production, exploration and development of natural gas and natural gas liquids (NGLs) from underground deposits in the Appalachian Basin.

18.     The Debtors conduct their drilling and exploration activities in the "stacked" liquid-rich Marcellus shale in Pennsylvania and dry gas Utica shale in Ohio.  The Utica shale is located a few thousand feet below the Marcellus shale.  While drilling in the Marcellus shale has been established in the oil and gas industry for many years, drilling opportunities in the Utica shale formation became viable for production in the late 2000s due to certain technological advancements in horizontal drilling.  These technological developments made land acquisition opportunities for E&P companies especially attractive in stacked shale geographical areas, such as the one where the Utica and Marcellus shale formations overlap.

19.     The Debtors have established a promising business with a profitable, cost-efficient and low-risk asset base concentrated in Monroe County, Ohio and Butler County, Pennsylvania through acquisitions of core stacked shale land positions in 2013 and 2014.  See Diagram A below for a map depicting the entire overlapping Utica and Marcellus shale play and the locations of the Debtors' acreage.[2]

---

[2] The Debtors' production represents approximately 1% of the total quantity of natural gas that is produced by upstream operators from the Marcellus and Utica shales.



**Diagram A**: Map of Marcellus and Utica shales and the Debtors' acreage

20.     The Debtors control contiguous positions of approximately 45,000 net acres,

consisting of:

- Approximately 32,000 net core acres in Butler County, Pennsylvania (divided into two production areas, "<u>Butler North</u>" (approximately 21,000 acres) located in the northeast corner of Butler County, and "<u>Butler South</u>" (approximately 11,000 acres) located in central Butler County), comprising a scaled, contiguous position in the Marcellus wet gas window, with an average 100% working interest and 14.6 % average royalty rate;

- Approximately 11,000 net acres in Monroe County, Ohio comprising high-pressure and high-quality dry Utica reservoir, and acreage which the Debtors believe are prospective for super wet Marcellus exploration, with an average 100% working interest, and 18.3% average royalty rate; and

- Approximately 2,000 net acres in Washington County, Ohio, with an average 100% working interest and 15.6% royalty rate.

The Debtors have entered into approximately 1,862 leases and own a working interest in approximately 60 producing wells located in Ohio and Pennsylvania.

21.     In May 2015, the Debtors began volume production of natural gas and NGLs and by 2018 had drilled and developed a total of 60 producing wells.  In 2018 alone, the Debtors drilled and brought online 14 new wells in the Marcellus shale and six new horizontal wells in the Utica shale.  By September 2018, the Debtors had over 175 MMcfd of production capacity with the potential to expand exploration and production into the Upper Devonian shale.[3]

22.     However, after the Revolution Explosion, the Debtors took measures to preserve capital and liquidity given the uncertainty with respect to their Pennsylvania operations, and began to reduce their drilling and capital expenditures in Pennsylvania.  On January 29, 2019, due to the Revolution Explosion and ETC's refusal to allow the Debtors to flow gas through ETC's gathering system on an on-demand basis, the Debtors were forced to shut in production and cease operation at all of their Butler County, Pennsylvania wells.  The Debtors' production has fallen by over one-third since the shut-in due to the Revolution Explosion.

23.     As of the Petition Date, the Debtors have 12 producing wells in Ohio with 3 additional wells in progress that if completed could come online by late 2019, and approximately 48 producing wells located in Pennsylvania that remain shut in due to the Revolution Explosion.

---

[3] The Upper Devonian shale is a liquids-rich shale field located above the stacked Marcellus and Utica shales. Shallower and softer than the Marcellus shale, the Upper Devonian is generally considered easier to drill, and E&P firms are able to drill into the Upper Devonian, Marcellus and Utica shales from the same well pads with minimal additional capital expenditure.

### B.       The Debtors' Finances and Employees

24.       For the twelve months ended December 31, 2018, the Debtors recorded consolidated net revenue of approximately $116.9 million, which was primarily derived from the sale of natural gas, NGLs and condensate.  Of their total revenues, $54.2 million (or 46%) originated from the Debtors' Pennsylvania production and $62.7 million (or 54%) from the Debtors' Ohio production.

25.       The Debtors currently employ a talented and dedicated workforce of forty-two (42) people in both full-time and part-time positions.  These employees have enabled the Debtors to continue to achieve high standards of productivity, efficiency, safety and environmental compliance in the face of recent headwinds.  The employees live and work primarily in Ohio and Pennsylvania.  None of the Debtors' employees is represented by a union or is subject to a collective bargaining agreement.  In addition, the Debtors employed independent contractors and temporary workers, who also provided critical support to the Debtors' field operations.

### C.       Corporate Structure

26.       EdgeMarc is a privately-held limited liability corporation and is the direct parent of EM Energy Employer LLC ("EM Employer") and EM Energy Manager LLC ("EM Manager").[4]  EM Employer, in turn, is the direct parent of each of the other Debtors, and all of the Debtors are organized under the laws of Delaware.  A corporate organization chart depicting the ownership structure of the Debtors is attached hereto as Exhibit A.  The majority of EdgeMarc's LLC units are owned by two private equity sponsors, Goldman Sachs Capital Partners ("Goldman Sachs") (holding 71.18% across three investment vehicles) and Ontario

---

[4] EM Manager owns 0.001% of EM Employer, while EdgeMarc owns 99.999% of EM Employer and 100% of EM Manager.

Teachers' Pension Plan ("Teachers") (holding 27.76%). The overall management of the Debtors is conducted by me, in my capacity as EdgeMarc's Chief Executive Officer, and Chief Financial Officer Alan Shepard at the Debtors' headquarters in Canonsburg, Pennsylvania.

### D. Capital Structure

27.     The Debtors' funded debt obligations consist entirely of secured obligations under that certain Amended and Restated Credit Agreement, dated as of December 19, 2017 (as amended, restated or otherwise modified from time to time, the "RBL Credit Agreement"), by and among EM Employer, as borrower, the other Debtors, as guarantors, the lenders from time to time party thereto and KeyBank National Association ("KeyBank") as administrative agent, collateral agent and letter of credit issuer (in such capacities, the "RBL Agent"). Under the RBL Credit Agreement, the Debtors had access to a revolving credit facility (the "Revolving Credit Facility") that could be used to either fund cash draws for working capital or support letters of credit issued by the RBL Agent. The Debtors' obligations under the RBL Credit Facility are secured by mortgages on oil and gas properties representing substantially all of the value of the Debtors' oil and gas properties included in the Debtors' most recent reserve report and liens on certain other assets.

28.     As of the Petition Date, the Debtors had approximately $77.79 million in outstanding obligations under the RBL Credit Facility, consisting of $47 million in drawn revolving credit obligations and $30,792,041 in issued and outstanding letters of credit. On a prepetition basis, the Debtors managed ordinary course commodity risks through hedging transactions with KeyBank under ISDA Master Agreements (the "Hedging Agreements"), which are secured under the Prepetition Credit Facility. As of May 8, 2019, the Debtors have approximately $791,000 in outstanding obligations under the Hedging Agreements.

11

E.    **Key Contractual Relationships**

29.    The Debtors principally conduct their drilling and extraction operations in Monroe County, Ohio and Butler County, Pennsylvania through Debtors EM Energy Ohio, LLC ("EdgeMarc OH") and EdgeMarc PA.  EdgeMarc, EdgeMarc OH and EdgeMarc PA entered into strategic agreements with third parties for gathering, processing, transporting and selling their natural gas and NGLs.  See Diagram B below for a schematic of the Debtors' gathering, compression, processing and firm transportation relationships.



**Diagram B:**  Schema of midstream and FT relationships

*i.*    Gathering & Processing Agreements

30.    The Debtors have gathering, compression, fractionation and processing agreements ("Gathering & Processing Agreements") with certain midstream counterparties under which they would deliver natural gas and NGLs extracted at certain drilling sites to be compressed, treated, and/or otherwise refined at processing centers.  In Ohio, the Debtors' natural gas from Monroe County is gathered, compressed and processed in a gathering system

owned by Eureka Midstream, LLC[5] ("Eureka," and the "Eureka Gathering System").[6]  In Butler County, Pennsylvania, the Debtors' wellheads and operations are clustered in Butler North and Butler South.  Prior to the "shut in" of Pennsylvania operations, the Debtors' natural gas from Butler North was to be gathered, compressed and processed in the Revolution System, including a cryogenic processing plant (the "Revolution Plant"), which ETC was contractually obligated to construct and put in commercial use under a gathering and processing agreement with the Debtors.  The Debtors' gas in Butler South was (i) gathered by ETC,[7] (ii) compressed by Axip Energy Services, LLC ("Axip"), and (iii) processed in cryogenic processing plants (collectively, the "Bluestone Processing Plant") owned and operated by MarkWest Energy Partners, LLC ("MarkWest").

> ### ii.    FT Agreements

31.    The Debtors have FT Agreements with certain long-haul pipeline services providers under which their natural gas is transported to final delivery points along certain long-distance local or interstate pipelines.  Until April 30, as discussed in more detail below and in the BP Rejection Motion, all of the Debtors' natural gas was purchased at these final delivery points by the Debtors' marketer, BP Energy Company ("BPEC," and together with its affiliates, "BP").

32.    In Ohio, the Debtors entered into FT Agreements to transport their natural gas products, chiefly methane,[8] from the Eureka Gathering System: (i) via two connected pipeline systems owned and operated by Rockies Express Pipeline, LLC ("REX") and Texas Gas

---

[5] In April 2019, Eureka Midstream, LLC was purchased by EQM Midstream Partners, LP.  The acquisition has not impacted the Debtors' operations.
[6] The Debtors' gathering and processing service provider in Washington County, Ohio is Blue Racer Midstream, LLC.
[7] The Debtors' gathering and processing agreement with ETC also contains minimum volume commitments ("MVCs") that require the Debtors to flow a minimum amount of gas through ETC's gathering systems or pay a fee.
[8] The gas transported via the pipelines governed by the FT Agreements described in this section is the methane gas.

Transmission, LLC ("TGT," and, respectively, the "REX Pipeline" and "TGT Pipeline," and the agreements governing such transport, respectively, the "REX FT Agreement" and "TGT FT Agreement"), which transport the natural gas to be sold to BPEC for domestic sale, and (ii) a pipeline owned and operated by Rover (the "Rover Pipeline"), which transports the natural gas to a northern delivery point to be sold to BP Canada and into the Canadian market, under an agreement with Rover (the "Rover OH FT Agreement").[9]

33.      In Pennsylvania, the Debtors entered into FT Agreements (i) in Butler North, with Rover to transport natural gas from the Revolution System, once constructed and placed in commercial service (the "Rover PA FT Agreement," and together with the Rover OH FT Agreement, the "Rover FT Agreements"), and (ii) in Butler South, with Dominion Energy Transmission, Inc. ("DTI") to transport natural gas from the Bluestone Processing Plant (the "DTI FT Agreement").  From Butler North, the Rover Pipeline transported the natural gas through a new lateral pipeline known as the Burgettstown Lateral.

34.      As discussed in more detail in the BP Rejection Motion, the TGT and Rover OH FT Agreements required credit support in the form of letters of credit.  BPEC provided both TGT and Rover with letters of credit ("LCs") in the amounts of approximately $23.3 million and $25 million, respectively (the "BP TGT LC") and "BP Rover LC").  Under EdgeMarc's marketing agreements with BP, EdgeMarc OH is contractually required to reimburse BPEC for any drawn amounts under these LCs as well as any associated charges and expenses.

35.      As described herein and in the FT Rejection Motion and the TGT Agreement

---

[9] On February 24, 2017, in anticipation of the need for long-haul transportation services of the gas processed at the Revolution Plant, EdgeMarc entered into an amended and restated rate schedule with Rover providing for firm transportation of specified contractual quantities of natural gas from the Revolution Plant to delivery points in Ohio via the Burgettstown Lateral pipeline (the "Amended Rover Agreement").  A portion of the natural gas under the Amended Rover Agreement would be delivered to REX in Clarington, Ohio (for ultimate delivery to TGT), and the balance would be delivered to the Rover Pipeline.

Rejection Motion, since the time that Debtors entered into the FT Agreements, subsequent

developments, including the Revolution Explosion, have made them economically burdensome

to the Debtors.  Specifically, in the second and third quarters of 2014,[10] during a sustained period

of elevated natural gas prices, the Debtors entered into the FT Agreements.  Under the FT

Agreements the Debtors are obligated to pay to reserve dedicated capacity—a maximum daily

quantity (the "Contractual Quantity")—on the pipelines.  The Debtors pay for such capacity even

if it is not being used.

36.     The Revolution Explosion and the subsequent shut-in of the Debtors'

Pennsylvania operations have prevented the Debtors from flowing gas sufficient to make use of

the Contractual Quantities they are required to pay for under the FT Agreements.  As a result, the

FT Agreements have become burdensome drains on the Debtors' finances.  As of the Petition

Date, the Debtors were not utilizing any capacity under the REX, Rover or TGT FT Agreements.

Accordingly, the Debtors have determined that it is in the best interest of the Debtors' estates to

reject the REX, Rover and TGT FT Agreements.

37.     As of the Petition Date, because the Debtors have "shut in" operations in

Pennsylvania, EdgeMarc PA is not utilizing any of the contracted-for capacity under the DTI FT

Agreement.  In Ohio, the Debtors are transporting their gas on an on-demand basis; the net

---

[10] At that time, there was a significant differential in price between natural gas sold in the Marcellus and Utica shale
regions and natural gas delivered out of state, and demand for pipeline capacity to transport from those regions
significantly exceeded supply.  Several pipeline operators modified existing pipelines (or constructed new pipelines)
to transport more natural gas out of the Marcellus and Utica shale regions.  The Debtors, who were drilling several
new wells with an eye to commencing production in 2015, saw the new pipelines as an opportunity to reserve a
sufficient amount of out-of-state transportation capacity at prices that would be locked in even if demand increased.
The Debtors accordingly entered into FT agreements with each of Rover, REX and TGT that provided the Debtors
with east-west transportation of natural gas in the quantities the Debtors were projected to need and at then-
competitive rates.

revenue in connection with transporting on an on-demand basis is expected to be favorable compared to transporting under the REX and TGT FT Agreements.

       *iii.*    <u>Marketing Agreements</u>

38.     The Debtors entered into marketing agreements with BPEC and BP Canada, under which the Debtors agreed to sell and deliver 100% of their natural gas production ("<u>BP Marketing Agreements</u>"). Under the BP Marketing Agreements, BP receives the Debtors' gas at delivery points along the various transportation pipelines described above and sells the gas onwards to its own customers. As described in more detail in the BP Rejection Motion, BPEC provided credit support to Rover and TGT in connection with the Rover OH and TGT FT Agreements, and the Debtors expect that both Rover and TGT will draw on those LCs, triggering EdgeMarc OH's obligation under one of its BP Marketing Agreements to reimburse BPEC for such draws. Due to the risk that BPEC may assert (i) a right of setoff as to prepetition amounts owing to the Debtors, and (ii) a right of recoupment as to all postpetition amounts owing to the Debtors until it receives the full amount of the approximately $48 million LC draw, the Debtors have determined that it is in the best interests of their estates to reject the BP Marketing Agreements and on May 1, 2019, ceased delivering product to BP and commenced delivering product to alternative marketers.

**F.**    **Cash Needs**

39.     The Debtors' business is capital intensive—it relies on their ability to use cash to, among other things, (a) satisfy payroll and overhead expenses, (b) fund working capital needs and make capital expenditures, (c) pay for goods or services critical to the health and safety of employees and the communities in which they operate, (d) pay property taxes and other taxes, and (e) use for other general corporate purposes.

16

40.     It is critical that the Debtors maintain the ability to access their cash in an uninterrupted and unlimited fashion (including pursuant to the DIP Financing described herein) so that they can have enough working capital to make payments to employees and other providers of goods and services.  Any limitation on the Debtors' use of cash would critically threaten their ability to operate their business and continue as a going concern, and would result in a disastrous deterioration of the Debtors' value.

41.     In order to avoid business disruption as the Debtors carry out their proposed sale process, and to preserve the value of the Debtors as a going concern in order to secure the highest possible price for their assets, the Debtors must be able to signal to their employees, contractual counterparties and other constituents that they continue to have access to sufficient liquidity to, among other things, continue the operation of their businesses as a going concern, meet payroll, pay capital expenditures, and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain their enterprise value.  As of the Petition Date, the Debtors had approximately $6 million in cash on hand.

## II.
## EVENTS LEADING TO THE CHAPTER 11 CASES

42.     On September 10, 2018, before the Revolution System was ever placed into commercial service, a segment of the pipeline in Beaver County, Pennsylvania along the Revolution System that connects ETC's compression plant to the Revolution Processing Plant, slid down a hill and exploded.  As a result of the Revolution Explosion, the Debtors were never able to use the Revolution System to gather and process natural gas from their well pads in Butler North.

43.     ETC's failure to place the Revolution System into commercial service by the Guaranteed In-Service Date triggered EdgeMarc's right to terminate the ITCs. Specifically, prior to their termination, there were two ITCs in place. "ITC-102" governed the Debtors' gas gathering services in Butler South. "ITC-101" was intended to govern the Debtors' gas gathering services in connection with the Revolution System and other services in Butler North. Because the Revolution Explosion occurred prior to the Guaranteed In-Service Date of the Revolution System, no gathering ever occurred under ITC-101 prior to its termination. ITC-101 provides the Debtors with the right to terminate if the Revolution System was not placed in commercial service by the Guaranteed In-Service Date. EdgeMarc provided written notice to ETC on January 29, 2019 that it was terminating ITC-101. Because ITC-102 is by its terms coterminous with ITC-101, EdgeMarc also notified ETC that ITC-102 was simultaneously terminated by operation of contract.

44.     Despite the termination of ITC-101 and ITC-102 on January 29, 2019, the GPA remained fully effective. Under the GPA, EdgeMarc is entitled to submit nominations[11] to ETC for the gathering of gas thereunder. Accordingly, on January 30, 2019, EdgeMarc submitted nominations for the quantity of natural gas that it expected to deliver to ETC for gathering during the month of February 2019, to be delivered to the Bluestone Processing Plant. ETC refused to accept the nominations.

**A.     ETC Litigation**

45.     Instead, on February 7, 2019, ETC filed a complaint in the Court of Common Pleas of Allegheny County, Pennsylvania alleging that EdgeMarc had failed to pay for amounts

---

[11] A "nomination" is an order by a natural gas shipper which sets forth the quantity of gas the shipper intends to run through a pipeline during a specified term.

18

allegedly due under the ITCs and seeking a declaration that the termination of the ITCs was not

valid (the "ETC Litigation").  *See ETC Northeast Pipeline, LLC* v. *EM Energy Pennsylvania,*

*LLC*, No. GD-19-002052 (Ct. Com. Pl., Allegheny Cnty., Feb. 7, 2019).  On February 27, 2019,

the Debtors filed an answer and counterclaims alleging that ETC had breached the GPA by

failing to put the Revolution System in commercial service by January 1, 2019 and failing to

gather and process contractually required volumes.  The Debtors also sought a declaratory

judgment that (i) the ITCs had been validly terminated as of January 29, 2019 and (ii) ETC had

improperly issued invoices under ITC-101, even though the system was not in commercial

service.

### B.      Shut-in of Butler County Wells

46.      Given ETC's refusal and/or inability to gather the Debtors' gas, the Debtors had

no choice but to pause production in Butler County due to the Revolution Explosion.

Accordingly, on January 29, 2019, the Debtors commenced the process of shutting in their wells

in Pennsylvania due to the Revolution Explosion and pausing their Pennsylvania operations until

the dispute with ETC could be resolved.  As a result, the Debtors lost the revenue they otherwise

captured from production at those wells, which at the time accounted for approximately 50

MMcfd, or approximately one third of the Debtors' revenue.

### C.      Effect of the Pennsylvania Shut-in on the Firm Transportation Agreements

47.      Due to the Revolution Explosion and the shut-in of their Pennsylvania wells, the

Debtors are unable to use any of the Contractual Quantities they are obligated to pay for under

their Pennsylvania FT Agreements.  However, the Debtors remain obligated to pay

approximately $4,600,000 in monthly fees for Contractual Quantities of 150 MDth/day in the

aggregate under the Rejected FT Agreements (as defined in the FT Rejection Motion) and the

TGT FT Agreements. Absent rejection, through the end of 2019, the Debtors would expect to pay in excess of $4 million under the TGT FT Agreements, $13.9 million under the Rover PA FT Agreements, and $5.2 million under the REX FT Agreements for unused Contractual Quantities.

### D. Borrowing Base Redetermination

48.    The Debtors' capacity to borrow or request LCs under the RBL Credit Facility is subject to a borrowing base (the "Borrowing Base") that is adjusted semi-annually, on April 15 and October 15 of each year, based on the value of the Debtors' oil and gas reserves and subject to certain procedures set forth in the RBL Credit Agreement. The Borrowing Base may also be adjusted one time during any fiscal year outside of the scheduled redetermination dates. Prior to March 18, 2019, the Debtors' Borrowing Base under the RBL Credit Agreement was $80 million.

49.    On March 15, 2019, KeyBank delivered a notice of redetermination to the Debtors stating that the RBL Facility borrowing base was redetermined to be $40 million effective March 18, 2019. The Debtors elected to prepay the difference between the amounts outstanding under the RBL Facility and the redetermined borrowing base in six equal monthly installments of approximately $6.4 million, commencing on May 1, 2019. The borrowing base as of the Petition Date was $40 million.

50.    On April 30, 2019, KeyBank delivered an executed forbearance letter extending the mandatory prepayment deadline from May 1, 2019 to May 8, 2019. On May 7, 2019, KeyBank agreed to extend the forbearance until May 15, 2019.

### III.
### PREPETITION RESTRUCTURING INITIATIVES

51.     Facing increased operational and financial challenges and a liquidity crisis from

the combination of the Revolution Explosion and onerous Contractual Quantities in certain FT

Agreements, in early 2019, the Debtors engaged Evercore Partners ("Evercore") and Davis Polk

& Wardwell LLP ("Davis Polk") to assist management with a review of strategic alternatives.

#### A.     Prepetition Negotiations with Certain Pipeline Operators and ETC

52.     In consultation with their professional advisors,[12] the Debtors determined to

approach both ETC and certain FT Agreement counterparties in an attempt to negotiate needed

contract modifications in the form of lower rates, MVCs and Contractual Quantities.  The

Debtors and their advisors developed a "Universal Proposal" that would adjust the rates, MVCs

and Contractual Quantities so that, as a whole, the Debtors' operations in Pennsylvania and Ohio

would become commercially feasible while the Debtors and ETC worked to resolve the ETC

Litigation.  However, the Debtors initially approached ETC and Rover and were unable to make

meaningful progress on the Universal Proposal.

#### B.     Prepetition Marketing Process

53.     Unable to reach a settlement and renegotiate commercial agreements on terms of

an out-of-court Universal Proposal, the Debtors explored the possibility of pursuing a sale of all

or substantially all of their assets to a third party in an out-of-court M&A process or a sale under

section 363 of the Bankruptcy Code.  The Debtors sought to market their assets prior to

commencing the Chapter 11 Cases.  In consultation with their advisors, the Debtors began by

focusing on a select group of parties that the Debtors believed could act most quickly for an out-

---

[12] In March 2019, the Debtors also engaged Opportune LLC as financial advisor and Landis Rath & Cobb LLC as co-counsel.

of-court M&A process. In addition, on March 27, 2019, the Debtors formed a Restructuring

Committee comprised of independent board member Patrick Bartels, Jr. In early May 2019, the

Debtors launched a broader marketing process to be consummated through a chapter 11

proceeding.

### C. Bidding Procedures

54. Substantially contemporaneously with the filing of this Declaration, the Debtors

have filed the Bidding Procedures Motion, seeking approval of bidding procedures for an auction

designed to maximize the value of the Debtors' assets for all stakeholders. To ensure that the

winning bid is the highest or otherwise best offer for the purchase of the their assets, the Debtors

have developed bidding and auction procedures to govern the sale. The Bidding Procedures

allow interested parties to submit bids for any or all of the Debtors' assets. Under the Bidding

Procedures, the Debtors plan to hold the auction on or prior to August 14, 2019 and close the sale

by September 17, 2019.

55. The Bidding Procedures are designed with the objective of generating the greatest

value for the Debtors' assets, while affording the Debtors maximum flexibility to execute such

asset sales in a quick and efficient manner. The Debtors are confident that the Bidding

Procedures and the other relief requested herein satisfy the requirements of section 363 of the

Bankruptcy Code and will facilitate the sale of the Assets for the best value for the benefit of all

of the Debtors' stakeholders.

### D. DIP Negotiations

56. In order to ensure that they would have sufficient liquidity to continue to operate

their businesses during the pendency of the Chapter 11 Cases and consummate the Section 363

Sale pursuant to the Bidding Procedures, the Debtors approached KeyBank—the agent and sole

lender under the RBL Facility—as well as potential third-party providers.  After a period of hard-fought, arm's-length negotiations, KeyBank agreed to provide post-petition financing on a secured and superpriority basis comprised of $30 million in new money financing and a roll-up of approximately $77.79 million in loans and letters of credit outstanding as of the Petition Date upon entry of the final order approving the post-petition financing (the "<u>DIP Facility</u>").

57.     The Debtors were unable to obtain a competitive post-petition financing facility from a third-party lender.  Critically, KeyBank was not willing to consent to the priming of the RBL security interests.  Unwilling to expose themselves to the risk and uncertainty of seeking to prime the RBL lenders non-consensually, the Debtors solicited proposals from third parties for financing that would refinance the RBL Facility in full or be provided on a junior or unsecured basis, but were unable to identify any party willing to provide the Debtors with financing on those terms.

58.     The DIP Facility will permit the Debtors to continue operations and make payments to employees and vendors on a post-petition basis.  Access to the DIP Facility is critical to the Debtors' ability to successfully carry out the sale process.

59.     I and the other members of the Debtors' management team were actively involved throughout the process of negotiating and securing DIP Financing.  Without the DIP Facility, the Debtors will experience an immediate liquidity shortfall and will be unable to maintain the level of operations necessary to preserve the value of their estates.  The principal terms of the DIP Facility are described in more detail in the DIP Motion and the Ross Declaration in support of the DIP Motion.  Following the arm's length prepetition negotiations over the DIP Financing between the Debtors and KeyBank, I believe that the ultimate proposal from the KeyBank was

the only and most advantageous financing proposal available to the Debtors, and believe that it is an exercise of the Debtors' sound business judgment to pursue the DIP Financing.

## VI.
## FIRST DAY MOTIONS AND CERTAIN OTHER MOTIONS FILED ON THE PETITION DATE

60.     To minimize the adverse effect of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtors' estate, the Debtors have filed the following First Day Motions and certain other motions on the Petition Date:

- Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases;

- Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Continue to Maintain Existing Cash Management System, Bank Accounts and Business Forms, (II) Continued Engagement in Intercompany Transactions, (III) Financial Institutions to Honor and Process Related Checks and Transfers, and (IV) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) and the United States Trustee Operating Guidelines;

- Motion of Debtors for Entry of (I) Interim and Final Orders Authorizing (A) the Debtors to (i) Pay Prepetition Employee Obligations and Other Compensation and (ii) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (B) Current and Former Employees to Proceed with Outstanding

24

Workers' Compensation Claims and (C) Financial Institutions to Honor and Process Related Checks and Transfers and (II) Final Order Authorizing the Debtors to Pay Amounts Under the Non-Insider Retention Plan;

- Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Taxes, Governmental Assessments and Fees and (II) Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Continue and Renew Their (A) Liability, Property, Casualty, and Other Insurance Policies and (B) Surety Bond Program and Honor All Obligations In Respect Thereof and (II) Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing, But Not Directing, the Payment of Prepetition Claims of Certain Lienholders;

- Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Use Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief;

- Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Honor Prepetition and Post-Petition Royalty Obligations, Working Interest Obligations and Other Obligations Related to Oil and Gas Leases;

- Motion of Debtors for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members;

- Application of Debtors to Approve the Employment and Retention of Landis Rath & Cobb LLP as Their Delaware Counsel, *Nunc Pro Tunc* to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rules 2014 and 2016 and Local Rule 2014-1;

- Application of Debtors for Authority to Employ and Retain Davis Polk & Wardwell LLP as Attorneys for the Debtors *Nunc Pro Tunc* to the Petition Date;

- Application of Debtors to Approve Employment and Retention of Opportune LLP as Restructuring Advisor Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, *Nunc Pro Tunc* to the Petition Date;

- Application of the Debtors for Entry of an Order, Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Authorizing the Retention and Employment of Evercore Group L.L.C. as Investment Banker for the Debtors and Debtors In Possession, *Nunc Pro Tunc* to the Petition Date, and Waiving Certain Time-Keeping Requirements of Local Rule 2016-2;

- Debtors' Application for an Order Authorizing Employment and Retention of Prime Clerk LLC as Administrative Advisor *Nunc Pro Tunc* to the Petition Date;

26

- Motion of Debtors for Entry of an Order Authorizing the Employment and Retention of Professionals Utilized in the Ordinary Course of Business;

- Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief;

- Motion of Debtors for Entry of an Order Authorizing the Rejection of the BP Marketing Contracts Pursuant to Section 365(A) of the Bankruptcy Code *Nunc Pro Tunc* to the Petition Date;

- Motion of Debtors for Entry of an Order Authorizing the Rejection Of Firm Transportation Service Agreements with Rover Pipeline LLC and Rockies Express Pipeline LLC Pursuant to Section 365(A) of the Bankruptcy Code *Nunc Pro Tunc* to the Petition Date;

- Motion of Debtors for Entry of an Order Authorizing the Rejection of Firm Transportation Service Agreements with Texas Gas Transmission, LLC Pursuant to Section 365(a) of the Bankruptcy Code *Nunc Pro Tunc* to the Petition Date;

- Motion of Debtors for Entry of an Order (I) Extending the time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs, (II) Extending the Time to Schedule the Meeting of Creditors, and (III) Authorizing the Debtors to File a Consolidated List of the Debtors' Twenty (20) Largest Unsecured Creditors;

61.     I have reviewed each of the First Day Motions and the other motions listed above, including any exhibits thereto, and incorporate by reference each of the factual statements set forth therein.  I believe that the relief requested by the First Day Motions and the other motions listed above is necessary to enable the Debtors to preserve and maximize value and efficiently implement their restructuring efforts without disruption or delay.

## **DECLARATION**

62.     Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 15, 2019            */s/ Callum Streeter*
     Canonsburg, Pennsylvania        Callum Streeter
                                      Chief Executive Officer

## EXHIBIT A

**DEBTORS' ORGANIZATIONAL STRUCTURE**



# EXHIBIT "C"

Execution Version

EM Holdco LLC
c/o Ontario Teachers' Pension Plan Board
5650 Yonge Street
Toronto, Ontario M2M 4H5


November 13, 2017


EdgeMarc Energy Holdings, LLC
1800 Main Street, STE 220
Canonsburg, PA 15317


GSCP VI EdgeMarc Holdings, L.L.C.
GSCP VI Parallel EdgeMarc Holdings, L.L.C.
WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C.
200 West Street, 28th Floor
New York, NY 10282


Ladies and Gentlemen:

This letter agreement sets forth the commitment of EM Holdco, LLC, a Delaware limited liability company ("Sponsor" and, together with its permitted assignees, "Sponsor"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, certain newly issued membership interests from EdgeMarc Energy Holdings, LLC ("EM Holdings").   EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer") are the parties to (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101") and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"; capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable), each dated as of the date hereof.   Sponsor understands that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Commitment Letter") with GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel EdgeMarc Holdings, L.L.C., and WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C. (collectively, the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

1.      Commitment. Subject to the terms and satisfaction of the conditions set forth herein, Sponsor hereby commits to purchase, or cause the purchase of, membership interests of EM Holdings from time to time for an aggregate amount in cash (such amount, the "Total Commitment") equal to 28.0612245% of $100,000,000.00 ($28,061,224.50), which amount to the extent contributed by Sponsor to EM Holdings pursuant to this letter agreement will in turn be contributed by EM Holdings to Shipper pursuant to that certain capital contribution letter (the "EM Holdings Capital Contribution Letter") between EM Holdings and Shipper dated as of the date hereof, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"); *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall Sponsor (taken together) (A) be obligated to contribute more than the Total Commitment to EM Holdings or (B) have any obligation with respect to the commitment of the Other Sponsor pursuant to the Other Commitment Letter and (ii) the parties agree and acknowledge that Sponsor may from time to time make capital contributions to EM Holdings other than pursuant to this letter agreement and in no event shall EM Holdings be obligated to contribute such funds to Shipper (and for the avoidance of doubt, Gatherer shall not have any rights with respect to such funds).  Sponsor may effect the purchase of membership interests of EM Holdings directly or indirectly through one or more affiliated entities.

2.      Commitment Timeline.

(a)      The Total Commitment shall be funded in three equal tranches: (i) $9,353,741.50 on February 1, 2018, (ii) $9,353,741.50 on March 15, 2018, and (iii) $9,353,741.50 on April 30, 2018 (each funding, a "Commitment" and each funding date, as may be extended pursuant to this Section 2, a "Commitment Date"); *provided*, *however*, that (i) if Gatherer delivers a Project Status Notice (as defined below) to Sponsor and Shipper, prior to an applicable Commitment Date (as may be extended pursuant to clause (ii) below for an unsatisfied condition in Section 3), in which Gatherer notifies Sponsor and Shipper that there has occurred any delay in the development, construction, or completion of the Gathering System described in ITC-101 that will delay the In-Service Date beyond July 1, 2018 (each such delay, a "Project Delay"), then (A) such Commitment Date shall be extended day-for-day by the number of days the In-Service Date is anticipated to be delayed as set forth in such Project Status Notice and (B) each subsequent Commitment Date shall be extended by a corresponding number of days and (ii) if one or more of the conditions set forth in Section 3 is not satisfied as of the applicable Commitment Date (as may be extended pursuant to clause (i) above for a Project Delay), then (A) such Commitment Date shall be extended until the date that is 10 business days following the date on which all such conditions are satisfied and (B) each subsequent Commitment Date shall be extended by a corresponding number of days.  Notwithstanding the foregoing, Sponsor may, in its sole discretion, fund any Commitment prior to its applicable Commitment Date.

(b)      Gatherer shall deliver a notice (a "Project Status Notice") to Sponsor and Shipper no earlier than 10 business days, and no later than five (5) business days, prior to each Commitment Date, which Project Status Notice shall contain a written certification of Gatherer that, as of the date of such Project Status Notice, either (i) there is no Project Delay or (ii) there is a Project Delay and the number of days that Gatherer anticipates the In-Service Date to be

2

delayed as a result of such Project Delay.  Without limiting the foregoing, Gatherer shall promptly notify Sponsor and Shipper as soon as it knows of any event reasonably likely to cause a delay in the In-Service Date.

3.    Conditions.  The obligation of Sponsor to fund each Commitment on a Commitment Date shall be subject to the satisfaction of each of the following conditions as of such Commitment Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice in advance of each Commitment Date pursuant to Section 2(b)) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, Sponsor's sole and exclusive remedy for the failure of any of the conditions set forth in this Section 3 to be satisfied prior to the applicable Commitment Date shall be limited to the delay in making the applicable Commitment(s) described in Section 2 and the termination rights set forth in Section 12.

4.    Enforceability.

(a)    Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than the Sponsor, EM Holdings and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce EM Holdings' right to cause the Commitment to be funded (but solely to the extent that EM Holdings is entitled to enforce the Commitment in accordance with the terms hereof).

(b)    For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from Sponsor by EM Holdings of funds in an aggregate amount that is equal to the Sponsor Commitment shall be the sole and exclusive remedy of EM Holdings, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against Sponsor or otherwise.

5.    Representations and Warranties.  Sponsor hereby represents and warrants to EM Holdings and Gatherer that:

(a)    it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by Sponsor and do not contravene any provision of Sponsor's organizational documents;

(b)    all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by Sponsor necessary for the due execution, delivery and performance of this letter agreement by Sponsor have been obtained or

3

made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by Sponsor is required in connection with the execution, delivery or performance of this letter agreement;

(c)     this letter agreement constitutes a legal, valid and binding obligation of Sponsor, enforceable against Sponsor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law); and

(d)     Sponsor has unfunded capital commitments or access to other available funds in an amount not less than the Commitment.

6.     <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of EM Holdings and Sponsor; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the EM Holdings Capital Contribution Letter, the Other Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 13, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between Sponsor or any of its Affiliates, on the one hand, and EM Holdings, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of EM Holdings and Sponsor.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.     <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) Sponsor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent Sponsor is bound hereby, except that no such transfer, delegation or assignment shall relieve Sponsor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.     <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby. Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract

4

or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York. Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby. Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

10.    <u>Counterparts</u>.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.    <u>Confidentiality</u>.  This letter agreement shall be treated as confidential and is being provided to EM Holdings solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of Sponsor and EM Holdings; *provided*, *however*, that Sponsor, EM Holdings or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom Sponsor or EM Holdings is contemplating a transfer of membership interests of EM Holdings (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof), and solely in the case of Sponsor, to (i) any regulatory authority to which the Sponsor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in EM Holdings and (iii) in connection with customary disclosures to its current or prospective investors.

12.    <u>Termination</u>.  This letter agreement, and all obligations hereunder including the obligation of Sponsor to fund the Commitment subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitment, (b) the termination of any of the GPA, ITC-101, ITC-102, the Other Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their

5

respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) the Sponsor's liability under or in respect of this letter agreement, any of the transactions contemplated hereby and/or any related matters is not limited to the amount of the Commitment, (ii) the limitation of such liability to the amount of the Commitment is illegal, invalid or unenforceable, in whole or in part or (iii) the Sponsor has any liability under any of the GPA, ITC-101, ITC-102, the Other Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of EM Holdings and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than Sponsor and EM Holdings and, for the limited purpose set forth in <u>Section 2(b)</u>, Gatherer) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that Sponsor may be a partnership or limited liability company, no Person, including EM Holdings or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of Sponsor or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than Sponsor and EM Holdings, a "<u>Sponsor Affiliate</u>"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Sponsor Affiliate, as such, for any obligation of Sponsor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.  Each of EM Holdings and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against Sponsor or any Sponsor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of EM Holdings against Sponsor or any Sponsor Affiliates, or otherwise, except for EM Holdings' right to obtain specific performance from Sponsor under this letter agreement (subject to the terms and conditions hereof).  EM Holdings hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against Sponsor or any Sponsor Affiliate, except for claims under this letter agreement for specific performance solely against Sponsor.  Each Sponsor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

#89995525v27
WEIL:\96277302\5\66319.0112

14.    _Notices_.  All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to Sponsor, to:

EM Holdco LLC
c/o Ontario Teachers' Pension Plan Board
5650 Yonge Street
Toronto, Ontario M2M 4H5
Attn: Romeo Leemrijse and Zvi Orvitz
Fax:        (416) 730-5082

with a copy to (which shall not constitute notice):

Ontario Teachers' Pension Plan Board
5650 Yonge Street
Toronto, Ontario M2M 4H5
Attn:        Law Department
Fax:        (416) 730-3771

If to EM Holdings, to:

EdgeMarc Energy Holdings, LLC
1800 Main Street, STE 220
Canonsburg, PA 15317
Attention:  Chief Financial Officer
Facsimile:  724-746-1419

with a copy to (which shall not constitute notice):

Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103
Attention:  Caroline Blitzer Phillips
Facsimile No: 917-849-5317

If to Gatherer, to:

ETC Northeast Pipeline, LLC
6051 Wallace Road Ext., Suite 300

7

Wexford, PA 15090
Attention:   Legal Department
Facsimile:   878-332-2611

*[Signature page follows]*

8

Very truly yours,

**EM HOLDCO LLC**

By: Ontario Teachers' Pension Plan Board,
its sole member

By: _____
Name:  Zvi Orvitz
Title:    Authorized Signatory

Agreed to and accepted:

EDGEMARC ENERGY HOLDINGS, LLC

By: _____
    Name:   BRIAN H. MCCULLOH
    Title:  CEO

Agreed to and accepted:

ETC NORTHEAST PIPELINE, LLC

By: _____
    Name: Mackie McCrea
    Title: Chief Commercial Officer

[Signature Page to Equity Commitment Letter]

# EXHIBIT "D"

GSCP VI Onshore EdgeMarc, L.L.C.
GSCP VI Offshore EdgeMarc, L.L.C.
GSCP VI Germany EdgeMarc, Inc.
GSCP VI GmbH HydroEdge (Cayman) Ltd.
GS Capital Partners VI Fund, L.P.
GS Capital Partners VI Offshore Fund, L.P.
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

GSCP VI Edgemarc Holdings, L.L.C.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to GSCP VI Edgemarc Holdings, L.L.C. (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitments of GSCP VI Onshore EdgeMarc, L.L.C., GSCP VI Offshore EdgeMarc, L.L.C., GSCP VI Germany EdgeMarc, Inc., GSCP VI GmbH HydroEdge (Cayman) Ltd., GS Capital Partners VI Fund, L.P. and GS Capital Partners VI Offshore Fund, L.P. (collectively, the "Investors"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary. The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and

policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

1.    Commitments. Subject to the terms and satisfaction of the conditions set forth herein, each Investor hereby commits to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set forth opposite its name in column 3 (Total Commitment) on Schedule I attached hereto (such Investor's total amount, the "Total Commitment") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of such Investor), which amount to the extent contributed or funded by an Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall an Investor (A) be obligated to contribute or fund more than such Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that an Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall any Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds).  An Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

2.    Commitment Timeline.  Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on Schedule I attached hereto (each funding, a "Commitment" and each funding date, as may be extended pursuant to this Section 2, a "Funding Date"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

3.    Conditions.  The obligation of the Investors to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to Section 2(b) of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, the Investors' sole and exclusive remedy for the failure of any of the conditions set forth in this Section 3 to be satisfied prior to the applicable Funding Date shall be limited to the

2

delay in making the applicable Commitment(s) described in <u>Section 2</u> and the termination rights set forth in <u>Section 12</u>.

4.     <u>Enforceability</u>.

(a)     Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)     For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to such Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

5.     <u>Representations and Warranties</u>. Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)     it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by such Investor and this letter agreement does not contravene any provision of such Investor's organizational documents;

(b)     all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by such Investor necessary for the due execution, delivery and performance of this letter agreement by such Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by such Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)     this letter agreement constitutes a legal, valid and binding obligation of such Investor , enforceable against such Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)     such Investor has unfunded capital commitments or access to other available funds in an amount not less than such Investor's Total Commitment.

6.     <u>No Modification; Entire Agreement</u>. This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the

prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Underlying Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and an Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.      <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) an Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent such Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve such Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.      <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby. Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.      <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under

or in connection with this letter agreement or any transaction contemplated hereby or thereby. Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this Section 9.

10.     Counterparts.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.     Confidentiality.  This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom an Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which such Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.     Termination.   This letter agreement, and all obligations hereunder including the obligation of the Investors to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) any Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of such Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the such Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investors and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that an Investor may be a partnership or limited liability company, no Person, including the Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investors or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than an Investor and the Commitment Beneficiary, a "<u>Investor Affiliate</u>"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of an Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against an Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against an Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from an Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against an Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against such Investor.  Each Investor Affiliate will be deemed a third party beneficiary of the rights in this <u>Section 13</u> and may enforce such rights hereunder.

14.    <u>Notices</u>.  All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to an Investor, to such address as set forth on <u>Schedule I</u>

with a copy to (which shall not constitute notice):

> Fried, Frank, Harris, Shriver & Jacobson, LLP
> One New York Plaza
> New York, NY 10004
> Attention: Mark H. Lucas
> Facsimile No: 212-859-4000

If to the Commitment Beneficiary, to:

> 200 West Street, 28th Floor
> New York, NY, 10282
> Attn: Scott Lebovitz
> CC: Deirdre Harding
> Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

> Fried, Frank, Harris, Shriver & Jacobson, LLP
> One New York Plaza
> New York, NY 10004
> Attention: Mark H. Lucas
> Facsimile No: 212-859-4000

If to Gatherer, to:

> ETC Northeast Pipeline, LLC
> 6051 Wallace Road Ext., Suite 300
> Wexford, PA 15090
> Attention:   Legal Department
> Facsimile:  878-332-2611

[*Signature page follows*]

Very truly yours,

GSCP VI OFFSHORE EDGEMARC, L.L.C.

By: _____
Name:
Title:


GSCP VI GMBH HYDROEDGE (CAYMAN) LTD.

By: _____
Name:
Title:


GSCP VI GERMANY EDGEMARC, INC.

By: _____
Name:
Title:


GS CAPITAL PARTNERS VI OFFSHORE FUND, L.P.

By:     GSCP VI Offshore Advisors, L.L.C.,
        its general partner

By: _____
Name:
Title:


Signature Page to Back-to-Back Equity Commitment Letter (GSCP VI Edgemarc Holdings, L.L.C.)

GS CAPITAL PARTNERS VI FUND, L.P.

By:    GSCP VI Advisors, L.L.C.,
       its general partner

By:    _____
       Name:
       Title:


GSCP VI ONSHORE EDGEMARC, L.L.C.

By:    _____
       Name:
       Title:

Agreed to and accepted:

GSCP VI EDGEMARC HOLDINGS, L.L.C.

By: _____
    Name:
    Title:

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea

Title: Chief commercial officer

## SCHEDULE I





REDACTED

# EXHIBIT "E"

GS Capital Partners VI GmbH & Co. KG
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

GSCP VI Germany EdgeMarc, Inc.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to GSCP VI Germany EdgeMarc, Inc. (the
"Commitment Beneficiary"), in connection with the transactions contemplated by the following
agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast
Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement
(Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual
Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the
Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102)
("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that
certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by
and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM
Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital
Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper,
which is being entered into in connection with Shipper's obligations under the GPA and ITCs on
the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations").
Capitalized terms used herein and not otherwise defined herein shall have the respective
meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof.
This letter agreement sets forth the commitments of GS Capital Partners VI GmbH & Co. KG
(the "Investor"), subject to the terms and conditions contained herein, to purchase, or cause the
purchase of, directly or indirectly through one or more intermediate entities, equity securities of
or fund indebtedness to the Commitment Beneficiary.  The parties hereto understand that,
simultaneously with the execution and delivery hereof, EM Holdings is entering into a
commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the
"Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to
any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly
controlling, controlled by or under common control with such Person and "control" when used
with respect to any Person means the power to direct the management and policies of such
Person, directly or indirectly, whether through the ownership of voting securities, by contract or
otherwise.

1.      Commitments. Subject to the terms and satisfaction of the conditions set
forth herein, the Investor hereby commits to purchase, or cause the purchase of, directly or
indirectly through one or more intermediate entities, equity securities of or fund indebtedness to
the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set

forth opposite its name in column 3 (Total Commitment) on <u>Schedule I</u> attached hereto (the Investor's total amount, the "<u>Total Commitment</u>") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of the Investor), which amount to the extent contributed or funded by the Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall the Investor (A) be obligated to contribute or fund more than the Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that the Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall the Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds). The Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

2.      <u>Commitment Timeline</u>.  Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on <u>Schedule I</u> attached hereto (each funding, a "<u>Commitment</u>" and each funding date, as may be extended pursuant to this <u>Section 2</u>, a "<u>Funding Date</u>"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

3.      <u>Conditions</u>.  The obligation of the Investor to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to <u>Section 2(b)</u> of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, the Investor's sole and exclusive remedy for the failure of any of the conditions set forth in this <u>Section 3</u> to be satisfied prior to the applicable Funding Date shall be limited to the delay in making the applicable Commitment(s) described in <u>Section 2</u> and the termination rights set forth in <u>Section 12</u>.

4.      <u>Enforceability</u>.

(a)      Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder

2

upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

   (b) For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to the Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

   5. <u>Representations and Warranties</u>.  Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

   (a) it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by the Investor and this letter agreement does not contravene any provision of the Investor's organizational documents;

   (b) all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by the Investor necessary for the due execution, delivery and performance of this letter agreement by the Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by the Investor is required in connection with the execution, delivery or performance of this letter agreement;

   (c) this letter agreement constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law); and

   (d) the Investor has unfunded capital commitments or access to other available funds in an amount not less than the Investor's Total Commitment.

   6. <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Underlying Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and

3

statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and the Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

       7.    <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) the Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent the Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve the Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

       8.    <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby.  Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

       9.    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby.  Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

       10.    <u>Counterparts</u>.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"),

each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.   Confidentiality.  This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom the Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which the Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.   Termination.   This letter agreement, and all obligations hereunder including the obligation of the Investor to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) the Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the the Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.   No Recourse.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investor and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that the Investor may be a partnership or limited liability company, no Person, including the

Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investor or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than the Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of the Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against the Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against the Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from the Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against the Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against the Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14.    Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to the Investor, to such address as set forth on Schedule I

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

If to the Commitment Beneficiary, to:

> 200 West Street, 28th Floor
> New York, NY, 10282
> Attn: Scott Lebovitz
> CC: Deirdre Harding
> Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

> Fried, Frank, Harris, Shriver & Jacobson, LLP
> One New York Plaza
> New York, NY 10004
> Attention: Mark H. Lucas
> Facsimile No: 212-859-4000

If to Gatherer, to:

> ETC Northeast Pipeline, LLC
> 6051 Wallace Road Ext., Suite 300
> Wexford, PA 15090
> Attention:   Legal Department
> Facsimile:   878-332-2611

[*Signature page follows*]

Very truly yours,

GS CAPITAL PARTNERS VI GMBH & CO. KG

By:     GS Advisors VI, L.L.C.,
        its managing limited partner

By:    _____
        Name:
        Title:

Agreed to and accepted:

GSCP VI GERMANY EDGEMARC, INC.

By: _____
    Name:
    Title:

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea

Title: Chief Commercial officer

## SCHEDULE I



# EXHIBIT "F"

GS Capital Partners VI GmbH & Co. KG
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

GSCP VI GmbH HydroEdge (Cayman) Ltd.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to GSCP VI GmbH HydroEdge (Cayman) Ltd. (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitments of GS Capital Partners VI GmbH & Co. KG (the "Investor"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary. The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

1.     Commitments. Subject to the terms and satisfaction of the conditions set forth herein, the Investor hereby commits to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set

forth opposite its name in column 3 (Total Commitment) on Schedule I attached hereto (the Investor's total amount, the "Total Commitment") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of the Investor), which amount to the extent contributed or funded by the Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall the Investor (A) be obligated to contribute or fund more than the Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that the Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall the Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds). The Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

2.     Commitment Timeline. Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on Schedule I attached hereto (each funding, a "Commitment" and each funding date, as may be extended pursuant to this Section 2, a "Funding Date"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

3.     Conditions. The obligation of the Investor to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to Section 2(b) of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date. Notwithstanding anything herein to the contrary, the Investor's sole and exclusive remedy for the failure of any of the conditions set forth in this Section 3 to be satisfied prior to the applicable Funding Date shall be limited to the delay in making the applicable Commitment(s) described in Section 2 and the termination rights set forth in Section 12.

4.     Enforceability.

(a)     Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder

upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)    For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to the Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

5.    <u>Representations and Warranties</u>.  Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)    it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by the Investor and this letter agreement does not contravene any provision of the Investor's organizational documents;

(b)    all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by the Investor necessary for the due execution, delivery and performance of this letter agreement by the Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by the Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)    this letter agreement constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)    the Investor has unfunded capital commitments or access to other available funds in an amount not less than the Investor's Total Commitment.

6.    <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Underlying Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and

statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and the Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.    <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) the Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent the Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve the Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.    <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby.  Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby.  Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

10.    <u>Counterparts</u>.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"),

each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.     Confidentiality.  This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom the Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which the Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.     Termination.    This letter agreement, and all obligations hereunder including the obligation of the Investor to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) the Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the the Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.     No Recourse.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investor and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that the Investor may be a partnership or limited liability company, no Person, including the

Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investor or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than the Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of the Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against the Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against the Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from the Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against the Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against the Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14.   Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to the Investor, to such address as set forth on Schedule I

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

6

If to the Commitment Beneficiary, to:

       200 West Street, 28th Floor
       New York, NY, 10282
       Attn: Scott Lebovitz
       CC: Deirdre Harding
       Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

       Fried, Frank, Harris, Shriver & Jacobson, LLP
       One New York Plaza
       New York, NY 10004
       Attention: Mark H. Lucas
       Facsimile No: 212-859-4000

If to Gatherer, to:

       ETC Northeast Pipeline, LLC
       6051 Wallace Road Ext., Suite 300
       Wexford, PA 15090
       Attention:  Legal Department
       Facsimile:  878-332-2611

[*Signature page follows*]

Very truly yours,

GS CAPITAL PARTNERS VI GMBH & CO. KG

By:    GS Advisors VI, L.L.C.,
       its managing limited partner

By:    _____
       Name:
       Title:

<u>Agreed to and accepted</u>:

GSCP VI GMBH HYDROEDGE (CAYMAN)
LTD.

By: _____
    Name:
    Title:

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea

Title: Chief Commercial Officer

## SCHEDULE I



# EXHIBIT "G"

GS Capital Partners VI Offshore Fund, L.P.
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

GSCP VI Offshore EdgeMarc, L.L.C.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to GSCP VI Offshore EdgeMarc, L.L.C. (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitments of GS Capital Partners VI Offshore Fund, L.P. (the "Investor"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary. The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

      1.     Commitments. Subject to the terms and satisfaction of the conditions set forth herein, the Investor hereby commits to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set

forth opposite its name in column 3 (Total Commitment) on <u>Schedule I</u> attached hereto (the Investor's total amount, the "<u>Total Commitment</u>") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of the Investor), which amount to the extent contributed or funded by the Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall the Investor (A) be obligated to contribute or fund more than the Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that the Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall the Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds). The Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

2.    <u>Commitment Timeline</u>.  Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on <u>Schedule I</u> attached hereto (each funding, a "<u>Commitment</u>" and each funding date, as may be extended pursuant to this <u>Section 2</u>, a "<u>Funding Date</u>"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

3.    <u>Conditions</u>.  The obligation of the Investor to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to <u>Section 2(b)</u> of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, the Investor's sole and exclusive remedy for the failure of any of the conditions set forth in this <u>Section 3</u> to be satisfied prior to the applicable Funding Date shall be limited to the delay in making the applicable Commitment(s) described in <u>Section 2</u> and the termination rights set forth in <u>Section 12</u>.

4.    <u>Enforceability</u>.

(a)    Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder

2

upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)     For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to the Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

5.     <u>Representations and Warranties</u>.  Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)     it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by the Investor and this letter agreement does not contravene any provision of the Investor's organizational documents;

(b)     all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by the Investor necessary for the due execution, delivery and performance of this letter agreement by the Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by the Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)     this letter agreement constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)     the Investor has unfunded capital commitments or access to other available funds in an amount not less than the Investor's Total Commitment.

6.     <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Underlying Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and

statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and the Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.    <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) the Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent the Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve the Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.    <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby.  Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby.  Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

10.    <u>Counterparts</u>.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"),

each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.    <u>Confidentiality</u>.  This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom the Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which the Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.    <u>Termination</u>.    This letter agreement, and all obligations hereunder including the obligation of the Investor to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) the Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the the Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investor and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that the Investor may be a partnership or limited liability company, no Person, including the

Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investor or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than the Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of the Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against the Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against the Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from the Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against the Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against the Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14.    Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to the Investor, to such address as set forth on Schedule I

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

If to the Commitment Beneficiary, to:

>200 West Street, 28th Floor
>New York, NY, 10282
>Attn: Scott Lebovitz
>CC: Deirdre Harding
>Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

>Fried, Frank, Harris, Shriver & Jacobson, LLP
>One New York Plaza
>New York, NY 10004
>Attention: Mark H. Lucas
>Facsimile No: 212-859-4000

If to Gatherer, to:

>ETC Northeast Pipeline, LLC
>6051 Wallace Road Ext., Suite 300
>Wexford, PA 15090
>Attention:  Legal Department
>Facsimile:  878-332-2611

[*Signature page follows*]

Very truly yours,

GS CAPITAL PARTNERS VI OFFSHORE FUND,
L.P.

By:     GSCP VI Offshore Advisors, L.L.C.,
        its general partner

By:     _____
        Name:
        Title:

Agreed to and accepted:

GSCP VI OFFSHORE EDGEMARC, L.L.C.

By: _____
    Name:
    Title:

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____   AGV
                                RM
Name: Mactie McCraa
Title: Chief Commercial Officer

## SCHEDULE I



# EXHIBIT "H"

GS Capital Partners VI Fund, L.P.
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

GSCP VI Onshore EdgeMarc, L.L.C.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to GSCP VI Onshore EdgeMarc, L.L.C. (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitments of GS Capital Partners VI Fund, L.P. (the "Investor"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary. The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

1.     Commitments. Subject to the terms and satisfaction of the conditions set forth herein, the Investor hereby commits to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set

forth opposite its name in column 3 (Total Commitment) on Schedule I attached hereto (the Investor's total amount, the "Total Commitment") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of the Investor), which amount to the extent contributed or funded by the Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall the Investor (A) be obligated to contribute or fund more than the Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that the Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall the Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds). The Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

      2.      Commitment Timeline. Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on Schedule I attached hereto (each funding, a "Commitment" and each funding date, as may be extended pursuant to this Section 2, a "Funding Date"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

      3.      Conditions. The obligation of the Investor to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to Section 2(b) of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date. Notwithstanding anything herein to the contrary, the Investor's sole and exclusive remedy for the failure of any of the conditions set forth in this Section 3 to be satisfied prior to the applicable Funding Date shall be limited to the delay in making the applicable Commitment(s) described in Section 2 and the termination rights set forth in Section 12.

      4.      Enforceability.

      (a)      Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder

upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)     For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to the Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

5.     <u>Representations and Warranties</u>.  Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)     it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by the Investor and this letter agreement does not contravene any provision of the Investor's organizational documents;

(b)     all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by the Investor necessary for the due execution, delivery and performance of this letter agreement by the Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by the Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)     this letter agreement constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law); and

(d)     the Investor has unfunded capital commitments or access to other available funds in an amount not less than the Investor's Total Commitment.

6.     <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Underlying Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and

statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and the Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.    <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) the Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent the Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve the Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.    <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby.  Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby.  Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

10.    <u>Counterparts</u>.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"),

each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.    <u>Confidentiality</u>.  This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom the Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which the Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.    <u>Termination</u>.    This letter agreement, and all obligations hereunder including the obligation of the Investor to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) the Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the the Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investor and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that the Investor may be a partnership or limited liability company, no Person, including the

Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investor or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than the Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of the Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against the Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against the Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from the Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against the Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against the Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14.   Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to the Investor, to such address as set forth on Schedule I

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

If to the Commitment Beneficiary, to:

       200 West Street, 28th Floor
       New York, NY, 10282
       Attn: Scott Lebovitz
       CC: Deirdre Harding
       Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

       Fried, Frank, Harris, Shriver & Jacobson, LLP
       One New York Plaza
       New York, NY 10004
       Attention: Mark H. Lucas
       Facsimile No: 212-859-4000

If to Gatherer, to:

       ETC Northeast Pipeline, LLC
       6051 Wallace Road Ext., Suite 300
       Wexford, PA 15090
       Attention:  Legal Department
       Facsimile:  878-332-2611

[*Signature page follows*]

Very truly yours,

GS CAPITAL PARTNERS VI FUND, L.P.

By:    GSCP VI Advisors, L.L.C.,
        its general partner

By: _____
     Name:
     Title:

Agreed to and accepted:

GSCP VI ONSHORE EDGEMARC, L.L.C.

By: _____
      Name:
      Title:

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea
Title: Chief Commercial Officer

## SCHEDULE I



# EXHIBIT "I"

GSCP VI Parallel EdgeMarc, L.L.C.
GS Capital Partners VI Parallel, L.P.
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

GSCP VI Parallel Edgemarc Holdings, L.L.C.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to GSCP VI Parallel Edgemarc Holdings, L.L.C. (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitments of GSCP VI Parallel EdgeMarc, L.L.C. and GS Capital Partners VI Parallel, L.P. (collectively, the "Investors"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary. The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

1.      Commitments. Subject to the terms and satisfaction of the conditions set forth herein, each Investor hereby commits to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to

the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set forth opposite its name in column 3 (Total Commitment) on <u>Schedule I</u> attached hereto (such Investor's total amount, the "<u>Total Commitment</u>") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of such Investor), which amount to the extent contributed or funded by an Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall an Investor (A) be obligated to contribute or fund more than such Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that an Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall any Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds).  An Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

2.   <u>Commitment Timeline</u>.  Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on <u>Schedule I</u> attached hereto (each funding, a "<u>Commitment</u>" and each funding date, as may be extended pursuant to this <u>Section 2</u>, a "<u>Funding Date</u>"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

3.   <u>Conditions</u>.  The obligation of the Investors to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to <u>Section 2(b)</u> of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, the Investors' sole and exclusive remedy for the failure of any of the conditions set forth in this <u>Section 3</u> to be satisfied prior to the applicable Funding Date shall be limited to the delay in making the applicable Commitment(s) described in <u>Section 2</u> and the termination rights set forth in <u>Section 12</u>.

4.   <u>Enforceability</u>.

(a)    Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)    For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to such Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

5.    <u>Representations and Warranties</u>. Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)    it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by such Investor and this letter agreement does not contravene any provision of such Investor's organizational documents;

(b)    all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by such Investor necessary for the due execution, delivery and performance of this letter agreement by such Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by such Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)    this letter agreement constitutes a legal, valid and binding obligation of such Investor , enforceable against such Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)    such Investor has unfunded capital commitments or access to other available funds in an amount not less than such Investor's Total Commitment.

6.    <u>No Modification; Entire Agreement</u>. This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer. Together with the Underlying Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company

Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and an Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.    <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) an Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent such Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve such Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.    <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby.  Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby.  Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

10.    Counterparts.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.    Confidentiality.  This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom an Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which such Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.    Termination.  This letter agreement, and all obligations hereunder including the obligation of the Investors to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) any Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of such Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the such Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    No Recourse.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investors and the Commitment Beneficiary) has any obligation hereunder

or in connection with the transactions contemplated hereby and that, notwithstanding that an Investor may be a partnership or limited liability company, no Person, including the Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investors or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than an Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of an Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against an Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against an Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from an Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against an Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against such Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14.    Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to an Investor, to such address as set forth on Schedule I

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas

6

Facsimile No: 212-859-4000

If to the Commitment Beneficiary, to:

        200 West Street, 28th Floor
        New York, NY, 10282
        Attn: Scott Lebovitz
        CC: Deirdre Harding
        Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

        Fried, Frank, Harris, Shriver & Jacobson, LLP
        One New York Plaza
        New York, NY 10004
        Attention: Mark H. Lucas
        Facsimile No: 212-859-4000

If to Gatherer, to:

        ETC Northeast Pipeline, LLC
        6051 Wallace Road Ext., Suite 300
        Wexford, PA 15090
        Attention:  Legal Department
        Facsimile:  878-332-2611

*[Signature page follows]*

Very truly yours,

GSCP VI PARALLEL EDGEMARC, L.L.C.

By: _____
Name:
Title:


GS CAPITAL PARTNERS VI PARALLEL, L.P.

By:    GS Advisors VI, L.L.C.,
       its general partner

By: _____
Name:
Title:

Agreed to and accepted:

GSCP VI PARALLEL EDGEMARC
HOLDINGS, L.L.C.

By: _____
    Name:
    Title:

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea

Title: Chief Commerial Officer

## SCHEDULE I



# EXHIBIT "J"

GS Capital Partners VI Parallel, L.P.
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

GSCP VI Parallel EdgeMarc, L.L.C.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to GSCP VI Parallel EdgeMarc, L.L.C. (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitments of GS Capital Partners VI Parallel, L.P. (the "Investor"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary.  The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

      1.      Commitments. Subject to the terms and satisfaction of the conditions set forth herein, the Investor hereby commits to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set

forth opposite its name in column 3 (Total Commitment) on Schedule I attached hereto (the Investor's total amount, the "Total Commitment") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of the Investor), which amount to the extent contributed or funded by the Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall the Investor (A) be obligated to contribute or fund more than the Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that the Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall the Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds). The Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

2.      Commitment Timeline.  Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on Schedule I attached hereto (each funding, a "Commitment" and each funding date, as may be extended pursuant to this Section 2, a "Funding Date"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

3.      Conditions.  The obligation of the Investor to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to Section 2(b) of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, the Investor's sole and exclusive remedy for the failure of any of the conditions set forth in this Section 3 to be satisfied prior to the applicable Funding Date shall be limited to the delay in making the applicable Commitment(s) described in Section 2 and the termination rights set forth in Section 12.

4.      Enforceability.

(a)      Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder

upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)    For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to the Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

5.    <u>Representations and Warranties</u>.  Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)    it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by the Investor and this letter agreement does not contravene any provision of the Investor's organizational documents;

(b)    all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by the Investor necessary for the due execution, delivery and performance of this letter agreement by the Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by the Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)    this letter agreement constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)    the Investor has unfunded capital commitments or access to other available funds in an amount not less than the Investor's Total Commitment.

6.    <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Underlying Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and

statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and the Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

       7.    <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) the Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent the Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve the Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

       8.    <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby.  Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

       9.    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby.  Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

       10.    <u>Counterparts</u>.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"),

each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.    Confidentiality.  This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom the Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which the Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.    Termination.    This letter agreement, and all obligations hereunder including the obligation of the Investor to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) the Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the the Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    No Recourse.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investor and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that the Investor may be a partnership or limited liability company, no Person, including the

Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investor or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than the Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of the Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against the Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against the Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from the Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against the Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against the Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14.    Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to the Investor, to such address as set forth on Schedule I

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

If to the Commitment Beneficiary, to:

      200 West Street, 28th Floor
      New York, NY, 10282
      Attn: Scott Lebovitz
      CC: Deirdre Harding
      Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

      Fried, Frank, Harris, Shriver & Jacobson, LLP
      One New York Plaza
      New York, NY 10004
      Attention: Mark H. Lucas
      Facsimile No: 212-859-4000

If to Gatherer, to:

      ETC Northeast Pipeline, LLC
      6051 Wallace Road Ext., Suite 300
      Wexford, PA 15090
      Attention:  Legal Department
      Facsimile:  878-332-2611

[*Signature page follows*]

Very truly yours,

GS CAPITAL PARTNERS VI PARALLEL, L.P.

By:    GS Advisors VI, L.L.C.,
       its general partner

By: _____
    Name:
    Title:

Agreed to and accepted:

GSCP VI PARALLEL EDGEMARC, L.L.C.

By: _____
Name:
Title:

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea

Title: Chief Commercial Officer

## SCHEDULE I



# EXHIBIT "K"

WSEP EdgeMarc, Inc.
West Street Energy Partners AIV-1, L.P.
West Street Energy Partners Offshore Holding-B AIV-1, L.P.
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C. (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitments of WSEP EdgeMarc, Inc., West Street Energy Partners AIV-1, L.P. and West Street Energy Partners Offshore Holding-B AIV-1, L.P. (collectively, the "Investors"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary. The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

1.   <u>Commitments</u>. Subject to the terms and satisfaction of the conditions set forth herein, each Investor hereby commits to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set forth opposite its name in column 3 (Total Commitment) on <u>Schedule I</u> attached hereto (such Investor's total amount, the "<u>Total Commitment</u>") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of such Investor), which amount to the extent contributed or funded by an Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall an Investor (A) be obligated to contribute or fund more than such Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that an Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall any Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds).  An Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

2.   <u>Commitment Timeline</u>.  Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on <u>Schedule I</u> attached hereto (each funding, a "<u>Commitment</u>" and each funding date, as may be extended pursuant to this <u>Section 2</u>, a "<u>Funding Date</u>"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

3.   <u>Conditions</u>.  The obligation of the Investors to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to <u>Section 2(b)</u> of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, the Investors' sole and exclusive remedy for the failure of any of the conditions set forth in this <u>Section 3</u> to be satisfied prior to the applicable Funding Date shall be limited to the delay in making the applicable Commitment(s) described in <u>Section 2</u> and the termination rights set forth in <u>Section 12</u>.

4.   <u>Enforceability</u>.

(a)   Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)   For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to such Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

5.   <u>Representations and Warranties</u>.  Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)   it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by such Investor and this letter agreement does not contravene any provision of such Investor's organizational documents;

(b)   all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by such Investor necessary for the due execution, delivery and performance of this letter agreement by such Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by such Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)   this letter agreement constitutes a legal, valid and binding obligation of such Investor , enforceable against such Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)   such Investor has unfunded capital commitments or access to other available funds in an amount not less than such Investor's Total Commitment.

6.   <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Underlying

3

Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and an Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.    <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) an Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent such Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve such Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.    <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby.  Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby.  Each party hereto acknowledges that it and the other parties hereto have been induced to enter

into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

10.    <u>Counterparts</u>.    This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.    <u>Confidentiality</u>.    This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom an Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which such Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.    <u>Termination</u>.    This letter agreement, and all obligations hereunder including the obligation of the Investors to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) any Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of such Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the such Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    <u>No Recourse</u>.    Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its

acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investors and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that an Investor may be a partnership or limited liability company, no Person, including the Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investors or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than an Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of an Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against an Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against an Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from an Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against an Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against such Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14. Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to an Investor, to such address as set forth on Schedule I

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP

One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

If to the Commitment Beneficiary, to:

200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding
Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

If to Gatherer, to:

ETC Northeast Pipeline, LLC
6051 Wallace Road Ext., Suite 300
Wexford, PA 15090
Attention:   Legal Department
Facsimile:  878-332-2611

[*Signature page follows*]

Very truly yours,

WEST STREET ENERGY PARTNERS AIV-1,
L.P.

By: Broad Street Energy Advisors AIV-1, L.L.C.
as General Partner

By: _____
Name:
Title:

WEST STREET ENERGY PARTNERS
OFFSHORE HOLDING – B AIV-1, L.P.

By: Broad Street Energy Advisors AIV-1, L.L.C.
as General Partner

By: _____
Name:
Title:

WSEP EDGEMARC, INC.

By: _____
Name:
Title:

<u>Agreed to and accepted</u>:

WSEP AND BRIDGE 2012 EDGEMARC
HOLDINGS, L.L.C.

By: _____
      Name:
      Title:

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea

Title: Chief commercial officer

SCHEDULE I



# EXHIBIT "L"

West Street Energy Partners AIV-1, L.P.
West Street Energy Partners Offshore Holding-B AIV-1, L.P.
West Street Energy Partners Offshore AIV-1, L.P.
200 West Street, 28th Floor
New York, NY, 10282

November 8, 2017

WSEP EdgeMarc, Inc.
200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding

Ladies and Gentlemen:

This letter agreement is being delivered to WSEP EdgeMarc, Inc. (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitments of West Street Energy Partners AIV-1, L.P., West Street Energy Partners Offshore Holding-B AIV-1, L.P. and West Street Energy Partners Offshore AIV-1, L.P. (collectively, the "Investors"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary. The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

1.     <u>Commitments</u>. Subject to the terms and satisfaction of the conditions set forth herein, each Investor hereby commits to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set forth opposite its name in column 3 (Total Commitment) on <u>Schedule I</u> attached hereto (such Investor's total amount, the "<u>Total Commitment</u>") (for the avoidance of doubt, which Total Commitments may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of such Investor), which amount to the extent contributed or funded by an Investor to the Commitment Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital Contribution Letter; *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall an Investor (A) be obligated to contribute or fund more than such Investor's Total Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree and acknowledge that an Investor may from time to time make capital contributions or fund indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in no event shall any Investor be obligated to contribute such funds to EM Holdings or Shipper (and for the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with respect to such funds).  An Investor may effect the purchase of equity securities or funding of indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated entities.

2.     <u>Commitment Timeline</u>.  Each Investor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as provided on <u>Schedule I</u> attached hereto (each funding, a "<u>Commitment</u>" and each funding date, as may be extended pursuant to this <u>Section 2</u>, a "<u>Funding Date</u>"); *provided*, *however*, that in the event a Commitment Date (as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be extended for a corresponding number of days.

3.     <u>Conditions</u>.  The obligation of the Investors to fund each Commitment on a Funding Date shall be subject to the satisfaction of each of the following conditions as of such Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the Underlying Commitment Letter) in advance of each Commitment Date pursuant to <u>Section 2(b)</u> of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, the Investors' sole and exclusive remedy for the failure of any of the conditions set forth in this <u>Section 3</u> to be satisfied prior to the applicable Funding Date shall be limited to the delay in making the applicable Commitment(s) described in <u>Section 2</u> and the termination rights set forth in <u>Section 12</u>.

4.   Enforceability.

(a)   Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than each Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)   For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to such Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Investor or otherwise.

5.   Representations and Warranties.  Each Investor, severally and not jointly, hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)   it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by such Investor and this letter agreement does not contravene any provision of such Investor's organizational documents;

(b)   all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by such Investor necessary for the due execution, delivery and performance of this letter agreement by such Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by such Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)   this letter agreement constitutes a legal, valid and binding obligation of such Investor , enforceable against such Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)   such Investor has unfunded capital commitments or access to other available funds in an amount not less than such Investor's Total Commitment.

6.   No Modification; Entire Agreement.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of each Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Underlying

3

Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 8, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and an Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby. Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of each Investor and the Commitment Beneficiary. Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.    <u>Assignment</u>. No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) an Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent such Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve such Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.    <u>Governing Law; Submission to Jurisdiction</u>. This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State. Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby. Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York. Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.    <u>Waiver of Jury Trial</u>. Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("<u>Applicable Law</u>"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby. Each party hereto acknowledges that it and the other parties hereto have been induced to enter

into this letter agreement by, among other things, the mutual waivers and certifications in this <u>Section 9</u>.

10.    <u>Counterparts</u>.  This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.    <u>Confidentiality</u>.  This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Investor and the Commitment Beneficiary; *provided*, *however*, that each Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom an Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which such Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

12.    <u>Termination</u>.  This letter agreement, and all obligations hereunder including the obligation of the Investors to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) any Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of such Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of the such Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its

acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than the Investors and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that an Investor may be a partnership or limited liability company, no Person, including the Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of the Investors or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than an Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of an Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against an Investor or any Investor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of the Commitment Beneficiary against an Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from an Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against an Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against such Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14.    Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to an Investor, to such address as set forth on Schedule I

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP

One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

If to the Commitment Beneficiary, to:

200 West Street, 28th Floor
New York, NY, 10282
Attn: Scott Lebovitz
CC: Deirdre Harding
Facsimile No: 212-357-5505

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attention: Mark H. Lucas
Facsimile No: 212-859-4000

If to Gatherer, to:

ETC Northeast Pipeline, LLC
6051 Wallace Road Ext., Suite 300
Wexford, PA 15090
Attention:   Legal Department
Facsimile:   878-332-2611

[*Signature page follows*]

Very truly yours,

WEST STREET ENERGY PARTNERS AIV-1, L.P.

By: Broad Street Energy Advisors AIV-1, L.L.C. as General Partner

By: _____
     Name:
     Title:

WEST STREET ENERGY PARTNERS OFFSHORE HOLDING – B AIV-1, L.P.

By: Broad Street Energy Advisors AIV-1, L.L.C. as General Partner

By: _____
     Name:
     Title:

WEST STREET ENERGY PARTNERS OFFSHORE AIV-1, L.P.

By: Broad Street Energy Advisors AIV-1, L.L.C. as General Partner

By: _____
     Name:
     Title:

<u>Agreed to and accepted</u>:

WSEP EDGEMARC, INC.

By: _____
    Name:
    Title:

<u>Agreed to and accepted:</u>

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea

Title: Chief Commercial Officer

## SCHEDULE I



Schedule I

# EXHIBIT "M"

**CAPITAL CONTRIBUTION LETTER**

CAPITAL CONTRIBUTION LETTER (this "**Capital Contribution Letter**") dated as of November 13, 2017, between EdgeMarc Energy Holdings, LLC ("**EM Holdings**"), EM Energy Pennsylvania, LLC ("**Shipper**") and ETC Northeast Pipeline, LLC ("**Gatherer**"), each a Delaware limited liability company.

WHEREAS, Shipper and Gatherer have entered into (i) that certain Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (as so amended, the "**GPA**"), (ii) that certain Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) (as so amended, "**ITC-101**") and (iii) that certain Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) (as so amended, "**ITC-102**" and, together with ITC-101, the "**ITCs**"; capitalized terms used herein and not otherwise defined herein have the respective meanings given such terms in the GPA or ITCs, as applicable), each dated as of November 13, 2017;

WHEREAS, pursuant to the ITCs, Shipper is obligated to deliver to Gatherer (i) equity commitment letters (the "**Commitment Letters**") from GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel EdgeMarc Holdings, L.L.C., WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C. and EM Holdco LLC (each, a "**Sponsor**" and together, the "**Sponsors**") committing the Sponsors to contribute to EM Holdings $100 million of new equity capital (the "**Capital Contribution Amount**") on the terms and subject to the conditions set forth therein and (ii) a capital contribution letter from EM Holdings committing EM Holdings to contribute, or cause to be contributed, to Shipper any funds received from the Sponsors under the Commitment Letters;

WHEREAS, the Sponsors have delivered the Commitment Letters to EM Holdings and Shipper; and

WHEREAS, EM Holdings indirectly owns all of the limited liability company interests in Shipper and as a result will benefit from execution and delivery of the ITCs and Gatherer's entry into certain transportation, storage, terminalling, shipping, purchase, sale and similar agreements with third parties including construction of certain facilities necessary for Gatherer to meet its performance obligations under the ITCs.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      *Capital Contribution.*  Subject to the conditions set forth herein, EM Holdings hereby agrees to contribute, or cause to be contributed, to Shipper all of the Capital Contribution Amount received by EM Holdings under the Commitment Letters immediately after the date that EM Holdings receives such funds from the Sponsors; *provided* that, for the sake of clarity, and except, in each case, for the $50 million commitment that EM Holdings is obligated to make to Shipper pursuant to, and contemporaneously with the execution of, the ITCs, (i) EM Holdings shall not, under any circumstances be obligated to contribute to or otherwise provide funds to Shipper in any amount in excess of the amount it has received from the Sponsors under the Commitment Letters and (ii) the parties agree and acknowledge that the Sponsor may from time

to time make capital contributions to EM Holdings other than pursuant to the Commitment Letters and in no event shall EM Holdings be obligated to contribute such funds to Shipper (and for the avoidance of doubt, Gatherer shall not have any rights with respect to such funds).

2.    *Conditions*.  The obligation of EM Holdings to contribute, or cause to be contributed, to Shipper any portion of the Capital Contribution Amount shall be subject to the funding of such portion of the Capital Contribution by the Sponsors pursuant to and in accordance with the Commitment Letters.

3.    *Representations and Warranties*. EM Holdings represents and warrants that:

a.    it has all necessary power and authority to execute, deliver and perform this Capital Contribution Letter, the execution, delivery and performance of this Capital Contribution Letter have been duly authorized by all necessary action by EM Holdings and do not contravene any provision of EM Holdings' organizational documents;

b.    all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by EM Holdings necessary for the due execution, delivery and performance of this Capital Contribution Letter by EM Holdings have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by EM Holdings is required in connection with the execution, delivery or performance of this Capital Contribution Letter;

c.    this Capital Contribution Letter constitutes a legal, valid and binding obligation of EM Holdings, enforceable against EM Holdings in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

d.    there are no actions, suits or proceedings by or before any arbitrator or court or other governmental authority pending against or, to the knowledge of EM Holdings, threatened against or affecting EM Holdings as to which there is a reasonable possibility of adverse determinations that, in the aggregate, could reasonably be expected to result in a material adverse effect on the ability of EM Holdings to perform its obligations under this Capital Contribution Letter.

4.    *Non-recourse*.  Notwithstanding anything that may be expressed or implied in this Capital Contribution Letter, or any document or instrument delivered in connection herewith other than the Commitment Letters, by its acceptance of the benefits of this Capital Contribution Letter, each of Shipper and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than EM Holdings and Shipper) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that EM Holdings may be a partnership or limited liability company, no Person, including Shipper or Gatherer, has any right of recovery against, and no recourse under this Capital Contribution Letter or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or

2

therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of EM Holdings or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than Shipper, an "**EM Holdings Affiliate**"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any EM Holdings Affiliate, as such, for any obligation of EM Holdings under this Capital Contribution Letter or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of Shipper and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against EM Holdings or any EM Holdings Affiliates, whether by piercing of the corporate veil, by a claim on behalf of Shipper against EM Holdings or any EM Holdings Affiliates, or otherwise, except for Shipper's right to obtain specific performance from EM Holdings under this Capital Contribution Letter (subject to the terms and conditions hereof). Shipper hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against EM Holdings or any EM Holdings Affiliate, except for claims under this Capital Contribution Letter for specific performance solely against EM Holdings. Each EM Holdings Affiliate will be deemed a third party beneficiary of the rights in this Section 4 and may enforce such rights hereunder.

5.  *Enforceability*.

a.  Except as otherwise expressly provided herein, no provision of this Capital Contribution Letter is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than EM Holdings and Shipper.  For the sake of clarity, Gatherer shall be entitled to rely on this Capital Contribution Letter insofar, and only insofar, as necessary to enforce Shipper's right to cause the Capital Contribution Amount or a portion thereof, as applicable, to be funded (but solely to the extent that Shipper is entitled to enforce the Capital Contribution Amount or a portion thereof, as applicable, in accordance with the terms hereof).

b.  For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from EM Holdings by Shipper of funds in an aggregate amount up to the Capital Contribution Amount shall be the sole and exclusive remedy of Shipper, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against EM Holdings or otherwise.

6.      *Termination*.  This Capital Contribution Letter and all obligations hereunder, including the obligation of EM Holdings to contribute the Capital Contribution Amount subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Capital Contribution Amount, (b) the termination of any of the GPA, ITC-101, ITC-102 or the Commitment Letters in accordance with their respective terms, and (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) EM Holdings' liability under or in respect of this Capital Contribution Letter, any of the transactions contemplated hereby and/or any related matters is not limited to the amount of the Capital Contribution Amount, (ii) the limitation of such liability to the amount of the Capital Contribution Amount is illegal, invalid or unenforceable, in whole or in part, or (iii) EM Holdings has any liability under any of the GPA, ITC-101 or the ITC-102, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

7.      *No Modification; Entire Agreement*.  This Capital Contribution Letter may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of EM Holdings and Shipper; provided that no amendment, modification or waiver of this Capital Contribution Letter shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the Commitment Letters, this Capital Contribution Letter constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between EM Holdings, on the one hand, and Shipper or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in Section 1 and Section 8 hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of EM Holdings and Shipper.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

8.      *Assignment*.  The rights and obligations of either party set forth herein may not be assigned or otherwise transferred to any other Person without the prior written consent of the other party hereto.  Any purported transfer or assignment of a party's rights or obligations hereunder in contravention of this Section 8 shall be null and void.

9.      *Governing Law; Submission to Jurisdiction*.  This Capital Contribution Letter shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this Capital Contribution Letter or any transaction contemplated hereby.  Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this Capital Contribution Letter or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 13 shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this Section 9.  Each party

4

irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Capital Contribution Letter or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

10.    *Waiver of Jury Trial*.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("**Applicable Law**"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Capital Contribution Letter or any transaction contemplated hereby or thereby.  Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this Capital Contribution Letter by, among other things, the mutual waivers and certifications in this Section 10.

11.    *Counterparts*.  This Capital Contribution Letter may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.    *Confidentiality*.  This Capital Contribution Letter shall be treated as confidential and is being provided to Shipper solely in connection with the GPA and the ITCs.  This Capital Contribution Letter may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of EM Holdings and Shipper; *provided*, *however*, that EM Holdings, Shipper or Gatherer may disclose the existence of this Capital Contribution Letter to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom the Sponsors or EM Holdings is contemplating a transfer of membership interests of EM Holdings (provided that such potential transferee is advised of the confidential nature of this Capital Contribution Letter and agrees to be bound by a confidentiality agreement consistent with the provisions hereof).

13.    *Notices*.  All notices, requests, claims, demands and other communications under this Capital Contribution Letter shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to EM Holdings, to:

EdgeMarc Energy Holdings, LLC
1800 Main Street, STE 220
Canonsburg, PA 15317
Attention:  Chief Financial Officer
Facsimile:  724-746-1419

5

with a copy to (which shall not constitute notice):

       Vinson & Elkins LLP
       666 Fifth Avenue, 26th Floor
       New York, NY 10103
       Attention:  Caroline Blitzer Phillips
       Facsimile: 917-849-5317

If to Shipper, to:

       EM Energy Pennsylvania, LLC
       1800 Main Street, STE 220
       Canonsburg, PA 15317
       Attention:   Chief Financial Officer
       Facsimile:  724-746-1419

with a copy to (which shall not constitute notice):

       Thompson & Knight LLP
       811 Main Street, Suite 2500
       Houston, Texas 77002
       Attention:  Doug Pedigo
       Facsimile: 832-397-8281

If to Gatherer, to:

       ETC Northeast Pipeline, LLC
       6051 Wallace Road Extension, Suite 300
       Wexford, PA 15090
       Attention:   Legal Department
       Facsimile:  878-332-2611

*[Signature page follows]*

EDGEMARC ENERGY HOLDINGS, LLC

By: _____
Name: BRIAN H. MCCUCCIE
Title: CEO

EM ENERGY PENNSYLVANIA, LLC

By: _____
Name: BRIAN H. MCCUCCIE
Title: CFO

ETC NORTHEAST PIPELINE, LLC

By: _____
Name: Mackie McCrea
Title: Chief Commercial Officer

*[Capital Contribution Letter Signature Page]*

# EXHIBIT "N"

Execution Version

Ontario Teachers' Pension Plan Board
5650 Yonge Street
Toronto, Ontario M2M 4H5

November 13, 2017

EM Holdco LLC
c/o Ontario Teachers' Pension Plan Board
5650 Yonge Street
Toronto, Ontario M2M 4H5
Ladies and Gentlemen:

This letter agreement is being delivered to EM Holdco LLC, a Delaware limited liability company (the "Commitment Beneficiary"), in connection with the transactions contemplated by the following agreements by and between EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer"): (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"), and, in connection therewith, (iv) that certain commitment letter (the "Underlying Commitment Letter"), dated as of the date hereof, by and between the Commitment Beneficiary and EdgeMarc Energy Holdings, LLC ("EM Holdings"), and (v) that certain capital contribution letter (the "EM Holdings Capital Contribution Letter"), dated as of the date hereof, by and between EM Holdings and Shipper, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable, each dated as of the date hereof. This letter agreement sets forth the commitment of Ontario Teachers' Pension Plan Board ("Investor"), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, directly or indirectly through one or more intermediate entities, equity securities of or fund indebtedness to the Commitment Beneficiary.  The parties hereto understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Underlying Commitment Letter") with GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel EdgeMarc Holdings, L.L.C., and WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C. (collectively, the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to

direct the management and policies of such Person, directly or indirectly, whether through the
ownership of voting securities, by contract or otherwise.

1.    Commitment. Subject to the terms and satisfaction of the conditions set
forth herein, Investor hereby commits to purchase, or cause the purchase of, directly or indirectly
through one or more intermediate entities, equity securities of or fund indebtedness to the
Commitment Beneficiary for cash in an aggregate amount that is equal to the amount set forth
opposite its name in column 3 (Total Commitment) on Schedule I attached hereto (Investor's
total amount, the "Total Commitment") (for the avoidance of doubt, which Total Commitment
may be satisfied, in whole or in part, by funding of indebtedness in the sole discretion of
Investor), which amount to the extent contributed or funded by Investor to the Commitment
Beneficiary pursuant to this letter agreement will in turn be contributed by the Commitment
Beneficiary to EM Holdings pursuant to the Underlying Commitment Letter, which in turn will
then be contributed by EM Holdings to Shipper pursuant to the EM Holdings Capital
Contribution Letter; provided that, for the sake of clarity, (i) in no event and under no
circumstances shall Investor (A) be obligated to contribute or fund more than Investor's Total
Commitment to the Commitment Beneficiary or (B) have any obligation with respect to the
commitment of the Commitment Beneficiary pursuant to the Underlying Commitment Letter or
the Other Sponsor pursuant to the Other Underlying Commitment Letter and (ii) the parties agree
and acknowledge that Investor may from time to time make capital contributions or fund
indebtedness to the Commitment Beneficiary other than pursuant to this letter agreement and in
no event shall Investor be obligated to contribute such funds to EM Holdings or Shipper (and for
the avoidance of doubt, EM Holdings, Shipper and Gatherer shall not have any rights with
respect to such funds).  Investor may effect the purchase of equity securities or funding of
indebtedness of the Commitment Beneficiary directly or indirectly through one or more affiliated
entities.

2.    Commitment Timeline.  Investor's Total Commitment shall be funded in
three equal tranches on the dates and in the amounts as provided on Schedule I attached hereto
(each funding, a "Commitment" and each funding date, as may be extended pursuant to this
Section 2, a "Funding Date"); provided, however, that in the event a Commitment Date
(as defined in the Underlying Commitment Letter) of the Commitment Beneficiary is extended
pursuant to Section 2 of the Underlying Commitment Letter, such Funding Date(s) shall be
extended for a corresponding number of days.

3.    Conditions.  The obligation of Investor to fund each Commitment on a
Funding Date shall be subject to the satisfaction of each of the following conditions as of such
Funding Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued
and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter
agreement or the Underlying Commitment Letter (including, for the avoidance of doubt, with
respect to Gatherer's obligation to timely deliver a Project Status Notice (as defined in the
Underlying Commitment Letter) in advance of each Commitment Date pursuant to Section 2(b)
of the Underlying Commitment Letter) or any of the GPA, ITC-101 or ITC-102 or if Gatherer
shall have committed any such material breach, such material breach shall have been cured in all
respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the
contrary, Investor's sole and exclusive remedy for the failure of any of the conditions set forth in
this Section 3 to be satisfied prior to the applicable Funding Date shall be limited to the delay in

2

making the applicable Commitment(s) described in <u>Section 2</u> and the termination rights set forth in <u>Section 12</u>.

4.    <u>Enforceability</u>.

(a)    Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than Investor, the Commitment Beneficiary and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce the Commitment Beneficiary's right to cause the Commitment to be funded (but solely to the extent that the Commitment Beneficiary is entitled to enforce the Commitment in accordance with the terms hereof).

(b)    For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from Investor by the Commitment Beneficiary of funds in an aggregate amount that is equal to Investor's Total Commitment shall be the sole and exclusive remedy of the Commitment Beneficiary, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against Investor or otherwise.

5.    <u>Representations and Warranties</u>.  Investor hereby represents and warrants to the Commitment Beneficiary and Gatherer that:

(a)    it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by Investor and this letter agreement does not contravene any provision of Investor's organizational documents;

(b)    all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by Investor necessary for the due execution, delivery and performance of this letter agreement by Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by Investor is required in connection with the execution, delivery or performance of this letter agreement;

(c)    this letter agreement constitutes a legal, valid and binding obligation of Investor, enforceable against Investor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)    Investor has unfunded capital commitments or access to other available funds in an amount not less than Investor's Total Commitment.

6.    <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of Investor and the Commitment Beneficiary; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer

3

hereunder, without the prior written consent of Gatherer. Together with the Underlying Commitment Letter, the EM Holdings Capital Contribution Letter, the Other Underlying Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 13, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between the Commitment Beneficiary or any of its Affiliates, on the one hand, and Investor, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby. Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of Investor and the Commitment Beneficiary. Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.     <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) Investor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent Investor is bound hereby, except that no such transfer, delegation or assignment shall relieve Investor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.     <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby. Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.     <u>Waiver of Jury Trial</u>.  Each party hereto <u>hereby waives</u>, to the fullest extent permitted by applicable law, regulation, order or decree ("Applicable Law"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby. Each party hereto acknowledges that it and the other parties hereto have been induced to enter

4

into this letter agreement by, among other things, the mutual waivers and certifications in this Section 9.

        10.      Counterparts. This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

        11.      Confidentiality. This letter agreement shall be treated as confidential and is being provided to the Commitment Beneficiary solely in connection with the Obligations. This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of Investor and the Commitment Beneficiary; *provided*, *however*, that Investor, the Commitment Beneficiary or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom Investor or the Commitment Beneficiary is contemplating a transfer of equity securities or indebtedness of the Commitment Beneficiary (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof) or to (i) any regulatory authority to which Investor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in the Commitment Beneficiary and (iii) in connection with customary disclosures to its current or prospective investors.

        12.      Termination. This letter agreement, and all obligations hereunder including the obligation of Investor to fund the Commitments subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of the Commitments, (b) the termination of any of the GPA, ITC-101, ITC-102, the Underlying Commitment Letter, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) (x) the Commitment Beneficiary's liability under or in respect of the Underlying Commitment Letter, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of the Commitment (as defined in the Underlying Commitment Letter), or (y) Investor's liability under or in respect of this letter agreement, any of the transactions contemplated thereby and/or any related matters is not limited to the amount of Investor's Total Commitment, (ii) (x) the limitation of such liability to the amount of the Commitment (as defined in the Underlying Commitment Letter) is illegal, invalid or unenforceable, in whole or in part, or (y) the limitation of such liability to the amount of Investor's Total Commitment is illegal, invalid or unenforceable, in whole or in part, or (iii) the Commitment Beneficiary has any liability under any of the GPA, ITC-101, ITC-102, the Other Underlying Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

        13.      No Recourse. Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of the Commitment Beneficiary and

5

Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than Investors and the Commitment Beneficiary) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that Investor may be a partnership or limited liability company, no Person, including the Commitment Beneficiary or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of Investor or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than Investor and the Commitment Beneficiary, a "Investor Affiliate"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Investor Affiliate, as such, for any obligation of Investor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of the Commitment Beneficiary and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against Investor or any Investor Affiliates, whether by piercing the corporate veil, by a claim on behalf of the Commitment Beneficiary against Investor or any Investor Affiliates, or otherwise, except for the Commitment Beneficiary's right to obtain specific performance from Investor under this letter agreement (subject to the terms and conditions hereof). The Commitment Beneficiary hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against Investor or any Investor Affiliate, except for claims under this letter agreement for specific performance solely against Investor. Each Investor Affiliate will be deemed a third party beneficiary of the rights in this Section 13 and may enforce such rights hereunder.

14.    Notices. All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to Investor, to such address as set forth on Schedule I

WEIL:\96290867\5\66319.0112

with a copy to (which shall not constitute notice):

        Ontario Teachers' Pension Plan Board
        5650 Yonge Street
        Toronto, Ontario M2M 4H5
        Attn:   Law Department
        Email:  law_investments@otpp.com
        Fax:    (416) 730-3771

If to the Commitment Beneficiary, to:

        EM Holdco LLC
        c/o Ontario Teachers' Pension Plan Board
        5650 Yonge Street
        Toronto, Ontario M2M 4H5
        Attn:   Romeo Leemrijse and Zvi Orvitz
        Email:  Romeo_Leemrijse@otpp.com
               Zvi_Orvitz@otpp.com
        Fax:    (416) 730-5082

with a copy to (which shall not constitute notice):

        Ontario Teachers' Pension Plan Board
        5650 Yonge Street
        Toronto, Ontario M2M 4H5
        Attn:   Law Department
        Email:  law_investments@otpp.com
        Fax:    (416) 730-3771

If to Gatherer, to:

        ETC Northeast Pipeline, LLC
        6051 Wallace Road Ext., Suite 300
        Wexford, PA 15090
        Attention:  Legal Department
        Facsimile:  878-332-2611

*[Signature page follows]*

7

Very truly yours,

**ONTARIO TEACHERS' PENSION PLAN BOARD**


By: _____
      Name:  Zvi Orvitz
      Title:   Authorized Signatory

<u>Agreed to and accepted</u>:

**EM HOLDCO LLC**

By: Ontario Teachers' Pension Plan Board,
    its sole member

By: _____
      Name:  Zvi Orvitz
      Title:   Authorized Signatory

Agreed to and accepted:

**ETC NORTHEAST PIPELINE, LLC**

By: _____

Name: Mackie McCrea

Title: Chief Commercial Officer

WEIL:\96290867\5\66319.0112

## SCHEDULE I



Schedule I

# EXHIBIT "O"

Execution Version

GSCP VI EdgeMarc Holdings, L.L.C.
GSCP VI Parallel EdgeMarc Holdings, L.L.C.
WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C.
200 West Street, 28th Floor
New York, NY, 10282

November 13, 2017

EdgeMarc Energy Holdings, LLC
1800 Main Street, STE 220
Canonsburg, PA 15317

EM Holdco LLC
c/o Ontario Teachers' Pension Plan Board
5650 Yonge Street
Toronto, Ontario M2M 4H5

Ladies and Gentlemen:

This letter agreement sets forth the commitment of GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel EdgeMarc Holdings, L.L.C., and WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C. (each, a "Sponsor" and collectively, the "Sponsors", in each case together with their permitted assignees), subject to the terms and conditions contained herein, to purchase, or cause the purchase of, certain newly issued membership interests from EdgeMarc Energy Holdings, LLC ("EM Holdings").  EM Energy Pennsylvania, LLC ("Shipper") and ETC Northeast Pipeline, LLC ("Gatherer") are the parties to (i) the Amended and Restated Gathering and Processing Agreement (Gatherer's Contract No. 9532-100) (the "GPA"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) ("ITC-101") and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) ("ITC-102" and, together with ITC-101, the "ITCs"; capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the GPA or ITCs, as applicable), each dated as of the date hereof.  Sponsors understand that, simultaneously with the execution and delivery hereof, EM Holdings is entering into a commitment letter (the "Other Commitment Letter") with EM Holdco LLC (the "Other Sponsor"). For purposes of this letter agreement, "Affiliate" shall mean, with respect to any person, corporation, trust or other entity ("Person"), any other Person directly or indirectly controlling, controlled by or under common control with such Person and "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

     1.    Commitment. Subject to the terms and satisfaction of the conditions set forth herein, each Sponsor hereby commits, severally and not jointly, to purchase, or cause the purchase of, membership interests of EM Holdings from time to time for an aggregate amount in cash that is equal to the amount set forth opposite such Sponsor's name in column 3 on Schedule

I hereto (with respect to each Sponsor, its "Total Commitment"), which amount to the extent contributed by Sponsor to EM Holdings pursuant to this letter agreement will in turn be contributed by EM Holdings to Shipper pursuant to that certain capital contribution letter (the "EM Holdings Capital Contribution Letter") between EM Holdings and Shipper dated as of the date hereof, which is being entered into in connection with Shipper's obligations under the GPA and ITCs on the terms and subject to the conditions of the GPA and ITCs (collectively, the "Obligations"); *provided* that, for the sake of clarity, (i) in no event and under no circumstances shall each Sponsor (A) be obligated to contribute more than its Total Commitment to EM Holdings or (B) have any obligation with respect to the commitment of the Other Sponsor pursuant to the Other Commitment Letter and (ii) the parties agree and acknowledge that each Sponsor may from time to time make capital contributions to EM Holdings other than pursuant to this letter agreement and in no event shall EM Holdings be obligated to contribute such funds to Shipper (and for the avoidance of doubt, Gatherer shall not have any rights with respect to such funds). Each Sponsor may effect the purchase of membership interests of EM Holdings directly or indirectly through one or more affiliated entities.

2. <u>Commitment Timeline</u>.

(a) Each Sponsor's Total Commitment shall be funded in three equal tranches on the dates and in the amounts as set forth on Schedule I hereto (each funding, a "Commitment" and each funding date, as may be extended pursuant to this <u>Section 2</u>, a "Commitment Date"); *provided*, *however*, that (i) if Gatherer delivers a Project Status Notice (as defined below) to Sponsors and Shipper, prior to an applicable Commitment Date (as may be extended pursuant to clause (ii) below for an unsatisfied condition in <u>Section 3</u>), in which Gatherer notifies Sponsors and Shipper that there has occurred any delay in the development, construction, or completion of the Gathering System described in ITC-101 that will delay the In-Service Date beyond July 1, 2018 (each such delay, a "Project Delay"), then (A) such Commitment Date shall be extended day-for-day by the number of days the In-Service Date is anticipated to be delayed as set forth in such Project Status Notice and (B) each subsequent Commitment Date shall be extended by a corresponding number of days and (ii) if one or more of the conditions set forth in <u>Section 3</u> is not satisfied as of the applicable Commitment Date (as may be extended pursuant to clause (i) above for a Project Delay), then (A) such Commitment Date shall be extended until the date that is 10 business days following the date on which all such conditions are satisfied and (B) each subsequent Commitment Date shall be extended by a corresponding number of days. Notwithstanding the foregoing, each Sponsor may, in its sole discretion, fund any Commitment prior to its applicable Commitment Date.

(b) Gatherer shall deliver a notice (a "Project Status Notice") to Sponsors and Shipper no earlier than 10 business days, and no later than five (5) business days, prior to each Commitment Date, which Project Status Notice shall contain a written certification of Gatherer that, as of the date of such Project Status Notice, either (i) there is no Project Delay or (ii) there is a Project Delay and the number of days that Gatherer anticipates the In-Service Date to be delayed as a result of such Project Delay. Without limiting the foregoing, Gatherer shall promptly notify Sponsors and Shipper as soon as it knows of any event reasonably likely to cause a delay in the In-Service Date.

3. <u>Conditions</u>. The obligation of each Sponsor to fund each Commitment on a Commitment Date shall be subject to the satisfaction of each of the following conditions as of

such Commitment Date: (i) in respect of any Commitment, no notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer shall not have committed any material breach of this letter agreement (including, for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver a Project Status Notice in advance of each Commitment Date pursuant to Section 2(b)) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed any such material breach, such material breach shall have been cured in all respects on or prior to the applicable Commitment Date.  Notwithstanding anything herein to the contrary, each Sponsor's sole and exclusive remedy for the failure of any of the conditions set forth in this Section 3 to be satisfied prior to the applicable Commitment Date shall be limited to the delay in making the applicable Commitment(s) described in Section 2 and the termination rights set forth in Section 12.

4.     Enforceability.

(a)     Except as otherwise expressly provided herein, no provision of this letter agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than the Sponsors, EM Holdings and their respective successors and assigns. For the sake of clarity, Gatherer shall be entitled to rely on this letter agreement insofar, and only insofar, as necessary to enforce EM Holdings' right to cause the Commitment to be funded (but solely to the extent that EM Holdings is entitled to enforce the Commitment in accordance with the terms hereof).

(b)     For the sake of clarity, except for a grant of specific performance in respect of any party's rights or obligations hereunder (but without duplication), receipt from each Sponsor by EM Holdings of funds in an aggregate amount that is equal to such Sponsor's Total Commitment shall be the sole and exclusive remedy of EM Holdings, Gatherer, any of their respective Affiliates or any of their respective directors, officers and other affiliated persons under this letter agreement against each Sponsor or otherwise.

5.     Representations and Warranties.  Each Sponsor, severally and not jointly, as to itself, hereby represents and warrants to EM Holdings and Gatherer that:

(a)     it has all necessary power and authority to execute, deliver and perform this letter agreement, the execution, delivery and performance of this letter agreement have been duly authorized by all necessary action by such Sponsor and do not contravene any provision of such Sponsor's organizational documents;

(b)     all consents, approvals, authorizations and permits of, filings with and notifications to, any governmental entity or any other Person by such Sponsor necessary for the due execution, delivery and performance of this letter agreement by such Sponsor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental entity by such Sponsor is required in connection with the execution, delivery or performance of this letter agreement;

(c)     this letter agreement constitutes a legal, valid and binding obligation of such Sponsor, enforceable against such Sponsor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other

3

similar laws affecting creditors' rights generally and (ii) general equitable principles (whether considered  in a proceeding in equity or at law); and

(d)    such Sponsor has unfunded capital commitments or access to other available funds in an amount not less than such Sponsor's Total Commitment.

6.    <u>No Modification; Entire Agreement</u>.  This letter agreement may not be amended or otherwise modified, and no provision contained herein may be waived, without the prior written consent of EM Holdings and each Sponsor; *provided* that no amendment, modification or waiver of this letter agreement shall adversely affect any right of Gatherer hereunder, without the prior written consent of Gatherer.  Together with the EM Holdings Capital Contribution Letter, the Other Commitment Letter and the Ninth Amended and Restated Limited Liability Company Agreement of EM Holdings, dated November 13, 2017, as amended, this letter agreement constitutes the sole agreement, and supersedes all prior agreements, understandings and statements, written or oral, between Sponsors or any of its Affiliates, on the one hand, and EM Holdings, any of its Affiliates or any other Person, on the other, with respect to the transactions contemplated hereby.  Except as expressly permitted in <u>Section 1</u> and <u>Section 7</u> hereof, no transfer of any rights or obligations hereunder shall be permitted without the prior written consent of EM Holdings and each Sponsor.  Any transfer in violation of the preceding sentence shall be null and void *ab initio*.

7.    <u>Assignment</u>.  No party may assign, delegate or otherwise transfer any of its rights or obligations under this letter agreement; *provided* that (a) each Sponsor may assign, delegate or otherwise transfer its rights or obligations to any of its Affiliates that agree to be bound to the same extent such Sponsor is bound hereby, except that no such transfer, delegation or assignment shall relieve such Sponsor of its obligations hereunder and (b) no other assignment, delegation or other transfer of any rights or obligations under this letter agreement may be made without the prior written consent of all of the parties hereto (including, for the avoidance of doubt, Gatherer).

8.    <u>Governing Law; Submission to Jurisdiction</u>.  This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of any U.S. federal or New York State court sitting in the County of New York, Borough of Manhattan, and any appellate court therefrom, for the purposes of any suit, action or other proceeding arising out of this letter agreement or any transaction contemplated hereby. Each party agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, in any way relating to this letter agreement or any transaction contemplated hereby in any forum other than in such courts located within New York.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in <u>Section 14</u> shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this <u>Section 8</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby in any court referred to above, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court

that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

9.     Waiver of Jury Trial.   Each party hereto hereby waives, to the fullest extent permitted by applicable law, regulation, order or decree ("Applicable Law"), any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this letter agreement or any transaction contemplated hereby or thereby. Each party hereto acknowledges that it and the other parties hereto have been induced to enter into this letter agreement by, among other things, the mutual waivers and certifications in this Section 9.

10.     Counterparts.   This letter agreement may be executed in any number of counterparts (including by facsimile or electronic transmission in "portable document format"), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

11.     Confidentiality.   This letter agreement shall be treated as confidential and is being provided to EM Holdings solely in connection with the Obligations.   This letter agreement may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of each Sponsor and EM Holdings; *provided*, *however*, that each Sponsor, EM Holdings or Gatherer may disclose the existence of this letter agreement to the extent required by Applicable Law or to each party's respective officers, directors, employees, advisors, representatives, agents and financing sources or to any Person to whom a Sponsor or EM Holdings is contemplating a transfer of membership interests of EM Holdings (provided that such potential transferee is advised of the confidential nature of this letter agreement and agrees to be bound by a confidentiality agreement consistent with the provisions hereof), and solely in the case of a Sponsor, to (i) any regulatory authority to which such Sponsor is subject if such disclosure is required, requested or deemed advisable by counsel in connection with any ongoing regulatory oversight, (ii) other beneficial holders of equity interests in EM Holdings and (iii) in connection with customary disclosures to its current or prospective investors.

12.     Termination.    This letter agreement, and all obligations hereunder including the obligation of each Sponsor to fund any Commitment subject to the terms and conditions herein, will terminate automatically and immediately upon the earliest to occur of (a) the payment in full of each Sponsor's Total Commitment, (b) the termination of any of the GPA, ITC-101, ITC-102, the Other Commitment Letter or the EM Holdings Capital Contribution Letter in accordance with their respective terms, (c) any assertion by Gatherer, its Affiliates or any of its or their respective officers, directors or representatives in any litigation or other proceeding (under any theory at law or in equity) that (i) any Sponsor's liability under or in respect of this letter agreement, any of the transactions contemplated hereby and/or any related matters is not limited to the amount of such Sponsor's Total Commitment, (ii) the limitation of such liability to the amount of such Sponsor's Total Commitment is illegal, invalid or unenforceable, in whole or in part or (iii) any Sponsor has any liability under any of the GPA, ITC-101, ITC-102, the Other Commitment Letter or the EM Holdings Capital Contribution Letter, any of the transactions contemplated thereby and/or any related matters other than its express obligations hereunder, and (d) January 1, 2019.

13.    <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this letter agreement, or any document or instrument delivered in connection herewith, by its acceptance of the benefits of this letter agreement, each of EM Holdings and Gatherer, on behalf of itself and its Affiliates, covenants, agrees and acknowledges that no Person (other than Sponsors and EM Holdings and, for the limited purpose set forth in <u>Section 2(b)</u>, Gatherer) has any obligation hereunder or in connection with the transactions contemplated hereby and that, notwithstanding that a Sponsor may be a partnership or limited liability company, no Person, including EM Holdings or Gatherer, has any right of recovery against, and no recourse under this letter agreement or under any document or instrument delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against, any former, current or future equity holders, controlling Persons, directors, officers, employees, agents, Affiliates, members, managers, managed accounts, general or limited partners, representatives or assignees of a Sponsor or any former, current or future equity holder, controlling Persons, director, officer, employee, general or limited partner, member, manager, managed account, Affiliate, agent, representative or assignee of any of the foregoing (each, other than Sponsors and EM Holdings, a "<u>Sponsor Affiliate</u>"), whether by the enforcement of any judgment, fine or penalty, or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Sponsor Affiliate, as such, for any obligation of any Sponsor under this letter agreement or the transactions contemplated hereby, under any documents or instruments delivered in connection herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation. Each of EM Holdings and Gatherer further agrees that neither it nor any of its Affiliates shall have any right of recovery against any Sponsor or any Sponsor Affiliates, whether by piercing of the corporate veil, by a claim on behalf of EM Holdings against any Sponsor or any Sponsor Affiliates, or otherwise, except for EM Holdings' right to obtain specific performance from a Sponsor under this letter agreement (subject to the terms and conditions hereof).  EM Holdings hereby covenants and agrees that it shall not institute, and shall cause its Affiliates not to institute, any proceeding or bring any other claim (whether in tort, contract or otherwise) arising under, or in connection with, the GPA, ITC-101 or the ITC-102 or the transactions contemplated thereby, or in respect of any oral representations made or alleged to be made in connection therewith, against any Sponsor or any Sponsor Affiliate, except for claims under this letter agreement for specific performance solely against such Sponsor.  Each Sponsor Affiliate will be deemed a third party beneficiary of the rights in this <u>Section 13</u> and may enforce such rights hereunder.

14.    <u>Notices</u>.  All notices, requests, claims, demands and other communications under this letter agreement shall be in writing and shall only be deemed given when received if delivered personally, on the next business day if sent by overnight courier for next business day delivery (providing proof of delivery), on receipt of confirmation if sent by facsimile to the other parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to a Sponsor, to such address as set forth on <u>Schedule I</u>

with a copy to (which shall not constitute notice):

    200 West Street, 28th Floor
    New York, NY 10282
    Attention:  Deirdre Harding
    Facsimile: 212-357-5505

If to EM Holdings, to:

    EdgeMarc Energy Holdings, LLC
    1800 Main Street, STE 220
    Canonsburg, PA 15317
    Attention:   Chief Financial Officer
    Facsimile:  724-746-1419

with a copy to (which shall not constitute notice):

    Vinson & Elkins LLP
    666 Fifth Avenue, 26th Floor
    New York, NY 10103
    Attention:  Caroline Blitzer Phillips
    Facsimile: 917-849-5317

If to Gatherer, to:

    ETC Northeast Pipeline, LLC
    6051 Wallace Road Ext., Suite 300
    Wexford, PA 15090
    Attention:   Legal Department
    Facsimile:  878-332-2611

[*Signature page follows*]

Very truly yours,

**GSCP VI EDGEMARC HOLDINGS, L.L.C.**

By: _____

    Name: Scott Lebovitz

    Title: Authorized Person

**GSCP VI PARALLEL EDGEMARC
HOLDINGS, L.L.C.**

By: _____

    Name: Scott Lebovitz

    Title: Authorized Person

**WSEP AND BRIDGE 2012 EDGEMARC
HOLDINGS, L.L.C.**

By: _____

    Name: Scott Lebovitz

    Title: Authorized Person

[Signature Page to Equity Commitment Letter]

<u>Agreed to and accepted</u>:

**EDGEMARC ENERGY HOLDINGS, LLC**

By: _____
    Name:   BRIAN H. MCCUBBIE
    Title:    CFO

Agreed to and accepted:

ETC NORTHEAST PIPELINE, LLC

By: _____

Name: Mackie McCrea

Title: Chief Commercial Officer

[Signature Page to Equity Commitment Letter]

## SCHEDULE I

